# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| CARLO M. CROCE, | : | |
| | : | Case No. 2:17-c-402 |
| **Plaintiff**, | : | |
| | : | Judge James L. Graham |
| v. | : | |
| | : | Magistrate Judge Elizabeth A. Preston |
| THE NEW YORK TIMES COMPANY, | : | Deavers |
| ET AL., | : | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendants.** | : | |

## FIRST AMENDED COMPLAINT

Plaintiff, Carlo M. Croce, for his First Amended Complaint against Defendants The New York Times Company, James Glanz, Agustin Armendariz, Arthur Ochs Sulzberger Jr., and Dean Baquet ("Defendants") alleges as follows:

## INTRODUCTION

1.      Plaintiff Carlo M. Croce, M.D., has devoted his life to cancer research.  He has been at it for more than forty-five years.  Since 2004, Dr. Croce's research has been conducted at The Ohio State University, where he is a distinguished professor and the John W. Wolfe Chair of Human Cancer Genetics.

2.      Dr. Croce's research and his discoveries have been repeatedly described by other distinguished scientists in his field as pioneering, paradigm-shifting, field-expanding, trailblazing, visionary, and meriting generational fame.

3.      One such scientist observed that "our current understanding of genetic mechanisms in cancer is based to a large extent on Dr. Croce's fundamental discoveries on chromosomal rearrangements and on the unique role of microRNAs in cancer."  Another said, "Carlo Croce has made fundamental contributions in the areas of oncology, genetics and

developmental biology that are already having a major impact in the diagnosis, prognosis and treatment of cancer.  Croce's record reflects a creative and rigorous experimental approach towards fundamental and important questions in cancer research spanning three decades of important contributions."

4.  The American Association for Cancer Research ("AACR") is the world's first and largest organization focused on cancer research with more than 37,000 members in 108 countries.  In April, 2017, the AACR described Dr. Croce as "a true champion of cancer research" whose "leadership and extraordinary achievements in cancer research or in support of cancer research have made a major impact on the field."

5.  Dr. Croce's discovery of the BCL2 gene has resulted in a drug, Venetoclax, that is now saving or prolonging the lives of those suffering with advanced chronic lymphocytic leukemia.

6.  On March 8-9, 2017, the New York Times published a front page article in its digital and print versions riddled with venomous and defamatory falsehoods about Dr. Croce (the "Defamatory Article").  The electronic distribution of the digital version of the Defamatory Article instantly dispersed those defamatory falsehoods to millions around the world.  In one day, that one article with its falsehoods provoked actual reasonable readers to condemn Dr. Croce as a "con man," a "fraud," a "crook," a "liar," a "cockroach" that "scurried out from under a rock," a "murderer," and a scientist "guilty of misconduct."

7.  This lawsuit seeks to remedy those falsehoods, to prove the truth, to restore Dr. Croce's good name, and to recover damages for both the pecuniary harm and the personal humiliation, loss of reputation, and mental and emotional anguish that Dr. Croce has suffered.

## THE PARTIES

### Carlo M. Croce, M.D.

8.      Plaintiff, Carlo M. Croce, M.D. is a citizen of Ohio.  He is the John W. Wolfe

Chair, Human Cancer Genetics at The Ohio State University ("OSU").  He is also the Director of

the Human Cancer Genetics Program, the Director of the Institute of Genetics, Professor of

Internal Medicine, and Chair of the Department of Cancer Biology & Genetics (formerly

Molecular Virology, Immunology & Medical Genetics), all at OSU.

### The New York Times

9.      The New York Times Company ("NYTC") is a corporation formed under the

laws of New York State, with its principle place of business in New York State, and is the

publisher of The New York Times, an American daily newspaper published in New York City.

The New York Times is distributed to Ohio residents and throughout the world by means of both

its print and digital versions, including through the company's website, NYTimes.com, and its

mobile device applications.   According to NYTC's filings with the Securities Exchange

Commission, the New York Times has more than 3 million subscribers.  According to the

Company, in 2016, NYTimes.com had a monthly average of approximately 85 million unique

visitors in the United States, with more than 122 million unique visitors worldwide.  Readership

of the New York Times increased during the first quarter of 2017.

10.     NYTC regularly does business in Ohio through, among other things, its printing

and distribution in Ohio of printed newspapers, its sales of newspapers in Ohio, its sales of paper

and digital subscriptions to Ohio residents, its sales of advertisements to Ohio companies, its

sales of content to Ohio news outlets, and its distribution of the digital version of the New York

Times and its mobile device applications to Ohio residents.

**James Glanz**

11.     James Glanz is a citizen of New York State, with his place of business at the offices of the New York Times in New York, New York.  Glanz is one of the authors of the Defamatory Article.

**Agustin Armendariz**

12.     Upon information and belief, Agustin Armendariz is a citizen of New Jersey who works and has his place of business at the offices of the New York Times in New York, New York.  Armendariz is one of the authors of the Defamatory Article.

**Arthur Ochs Sulzberger Jr.**

13.     Upon information and belief, Arthur Ochs Sulzberger Jr. is a citizen of New York State who works and has his place of business at the offices of the New York Times in New York, New York.  At the time the Defamatory Article was published, he was the publisher of the New York Times.

**Dean Baquet**

14.     Upon information and belief, Dean Baquet is a citizen of New York State who works and has his place of business at the offices of the New York Times in New York, New York.  He is the executive editor of the New York Times.

**JURISDICTION AND VENUE**

15.     This court has subject matter diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.  Complete diversity exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This court has personal jurisdiction over NYTC pursuant to Ohio Revised Code §2307.382(A)(1) because Defendant "transact[s] business in this state."

17.     This court has personal jurisdiction over NYTC pursuant to Ohio Revised Code §2307.382(A)(4) because NYTC "caus[ed] tortious injury in this state by an act or omission outside this state" and "regularly does or solicits business, or engages in [a] persistent course of conduct [and] derives substantial revenue from goods used or consumed or services rendered in this state."

18.     This court has personal jurisdiction over all Defendants pursuant to Ohio Revised Code §2307.382(A)(6) because Defendants "caus[ed] tortious injury in this state to [Plaintiff] by an act outside this state committed with the purpose of injuring persons, when [they] might reasonably have expected that some person would be injured thereby in this state."

19.     Further, this court has personal jurisdiction over Glanz pursuant to Ohio Revised Code §2307.382(A)(3) because he caused "tortious injury by an act or omission in this state."

20.     The exercise of jurisdiction over the Defendants is consistent with Due Process.

21.     Venue is proper in this court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within this district and all defendants are subject to personal jurisdiction in this district.

## STATEMENT OF FACTS

### Dr. Carlo M. Croce

22.     Dr. Croce is a pioneer of research into the genetic mechanisms of cancer.  He began his research into genetic anomalies in cancer at a time when little was known of the human genome.

23.     Dr. Croce's decades-long work thereafter uncovered the early events involved in the pathogenesis of leukemias and lymphomas, and lung, nasopharyngeal, head and neck, esophageal, gastrointestinal and breast cancers.

24.     Dr. Croce's discoveries have led to revolutionary innovations in the development of novel and successful approaches to cancer prevention, diagnosis, monitoring and treatment, based on gene-target discovery, verification and rational drug development.  In his remarkable career, Dr. Croce's research has resulted in discoveries that have been described as "tectonic," "paradigm-shifting," and "fundamental guideposts for current and future efforts to defeat cancer."

25.     As just one example, Dr. Croce discovered the BCL2 gene and the mechanisms of its activation.  This discovery led to the development of a drug, ABT-199 or Venetoclax (also called Venclexta), for the treatment of chronic lymphocytic leukemia, the most common human leukemia.  The FDA reported that 80 percent of clinical trial participants who have a 17p deletion (a particularly high-risk form of CLL) and were treated with Venetoclax experienced complete or partial remission of their cancer.  The FDA therefore gave Venclexta a "breakthrough therapy designation" with "priority review status" and "accelerated approval" for patients who have CLL with a 17p deletion.  Venetoclax is now described as a "powerful new kind of cancer drug."  Dr. Croce's discovery of the BCL2 gene has in fact resulted in prolonging or saving the lives of those afflicted with CLL and will likely continue to prolong or save the lives of many more.  Recent findings from a clinical trial presented in December 2017 show that treatment with Venetoclax combined with Rituximab produced a two-year progression-free survival rate of 84.9% in patients with relapsed or refractory CLL. By comparison, treatment with Rituximab combined with Treanda produced a two-year progression-free survival rate of 36.3%.

26.     Since 1975, Dr. Croce has been honored on more than sixty-four occasions with awards recognizing the path-breaking and paradigm-shifting importance of his research and discoveries in the field of genetics.  To name just a few, Dr. Croce received:

a.      the 1993 Mott Award from the General Motors Cancer Foundation, which is awarded for the "most outstanding recent contribution related to the cause or prevention of cancer";

b.      the 1999 Pezcoller Award from the American Association for Cancer Research, which was created in 1997 "to recognize a scientist who has made a major scientific discovery in basic cancer research, or who has made significant contributions to translational cancer research; who continues to be active in cancer research, and has a record of recent and noteworthy publications; and whose ongoing work holds promise for continued substantive contributions to progress in the field of cancer";

c.      the 2006 Clowes Memorial Award from the American Association for Cancer Research for his discoveries of the molecular mechanisms of leukemia;

d.      the 2013 Jeffrey A. Gottlieb Memorial Award for "his discovery that non-coding RNAs are involved in cancer pathogenesis"; and

e.      the 2013 InBev-Baillet Latour Fund International Health Prize (2013) for "his discovery that non-coding RNAs are involved in cancer pathogenesis."  The Chair of the Committee that awarded that prize to Dr. Croce was Professor Harald zur Hausen, the 2008 winner of the Nobel Prize in Physiology or Medicine.

27.     Most recently, on April 1, 2017, Dr. Croce received the 11th Annual AACR Margaret Foti Award for Leadership and Extraordinary Achievements in Cancer Research (the

"Foti Award").  The AACR's Foti Award "recognizes a true champion of cancer research, an individual who embodies the sustained commitment of Margaret Foti to the prevention and cure of cancer," and is "given to an individual whose leadership and extraordinary achievements in cancer research or in support of cancer research have made a major impact on the field."  The decision to give this award to Dr. Croce was made and announced prior to the publication of the Defamatory Article.

28.     In presenting the Foti Award to Dr. Croce, the AACR stated that it chose Dr. Croce because of his consistent and long-standing impact on the translation of fundamental cancer mechanisms to clinical applications and his extraordinary scientific leadership in the national and international scene, including research administration and mentorship of talented young investigators.  Specifically, the AACR noted the following:

a.     Dr. Croce's groundbreaking research has involved the positional cloning and characterization of numerous genes at chromosomal translocation breakpoints in cancer cells and the masterful translation of these discoveries to strategies for cancer prevention, early detection, and therapy.

b.     More recently, Dr. Croce's work on understanding the role of microRNAs in cancer pathogenesis has identified specific microRNA signatures associated with the diagnosis and prognosis of certain cancers and has defined microRNAs that function as oncogenes or tumor suppressors.

c.     In addition to his paradigm-shifting work, Dr. Croce has had an immense impact on both the international and national cancer research communities.

29.     Dr. Croce has been a Member of the National Academy of Sciences for more than twenty years.  Scientists are elected by their peers to membership in the National Academy of Sciences for their outstanding contributions to research.  Dr. Croce is also a Member of the American Academy of Arts and Sciences and a Member of the National Academy of Medicine. He is also a Fellow of the Academy of the American Association for Cancer Research, a Fellow

of the American Association for the Advancement of Science, and a member of The National Academy of Inventors.

### Dr. Croce's Papers

30.     Dr. Croce's research has been reported in the major research journals, including Nature, Science, Cell, Cancer Cell, Journal of Clinical Oncology, The Lancet Oncology, Journal of the National Cancer Institute and Cancer Research, and the Proceedings of the National Academy of Sciences, among many others.

31.     Over the course of Dr. Croce's more than forty-five year career, approximately 490 papers have been published in scientific journals reporting scientific research all or a substantial portion of which was done in Dr. Croce's laboratory and written entirely or in substantial part by Dr. Croce or by those performing research under his supervision in his laboratory (hereinafter referred to as "Dr. Croce's Research Papers").

32.     Dr. Croce has also written, either alone or with colleagues, approximately 165 additional papers published in scientific journals or books that are not research papers but are instead papers that either review work done on a particular scientific issue ("Review Papers") or comment on papers done by others ("Commentary Papers").

33.     In addition, Dr. Croce has over the years developed important reagents (novel compounds used in molecular biology and genetics research), genetically modified mice, and methods for microRNA profiling (collectively "Materials and Profiling") that facilitate genetic research into the causes of cancer.  Dr. Croce has, upon request, provided Materials and Profiling generously, and without charge, to other cancer researchers for use in their research in their own laboratories.  Dr. Croce has done this hundreds of times.  However, neither Dr. Croce nor his laboratory conducted the research that utilized those Materials and/or Profiling that Dr. Croce

9

provided to those other cancer researchers. In some cases, without these Materials and/or Profiling, the other cancer researchers could not have conducted the research. In other cases, the Materials and/or Profiling allowed the research to be conducted more quickly. To recognize Dr. Croce's having provided those Materials and/or Profiling, those other scientists have often named Dr. Croce as a coauthor of the resulting paper. This practice was not unusual.

### Corrections, Withdrawals and Retractions

### Corrections

34. Scientific research papers are complex publications and, like all publications, sometimes contain honest errors. Those errors can be the result of mistakes made by the authors, by the journal editors, and/or by the journals themselves that publish the papers. No scientist, indeed no human, is impervious to error. In recognition of this fact, the federal regulations governing research misconduct on biomedical projects utilizing any federal funds explicitly exclude honest error (as well as differences of opinion) from the definition of research misconduct. 42 C.F.R. §93.103(d). All of Dr. Croce's Research Papers have been and are governed by these federal regulations.

35. Despite the large number and complexity of Dr. Croce's Research Papers, very few of them have been subject to any correction. Dr. Croce's Research Papers, like almost all research papers, contain multiple images of experimental results and other scientific information (called "figures," many of which contain "sub-figures"). Of Dr. Croce's approximately 490 Research Papers, a total of 8 of them (less than 2%) have been the subject of corrections to a figure or sub-figure. At least one of those 8 corrections was published after the publication of the Defamatory Article. Of the more than 5,000 figures and sub-figures in Dr. Croce's Research Papers, fewer than 20 (fewer than 0.5%) have been the subject of any correction. All of them

were the result of honest error in the construction of the figures or sub-figures for publication. At least one of those corrections concerned only the inadvertent switching of two labels within a sub-figure. None of the errors or their corrections affected the scientific results of any of the papers.

36. Three of Dr. Croce's Research Papers (about 0.6%) have been corrected for "text overlap." One of those 3 corrections was published after the publication of the Defamatory Article. Each of those corrections specifically states that no concerns have been raised regarding the originality, the results, or the conclusions of the research reported in those Research Papers. One Review Paper has been corrected for text overlap, and that correction was published after publication of the Defamatory Article.

**Withdrawals**

37. In scientific publishing, the "withdrawal" of a paper occurs when the authors of a paper make the decision to withdraw it from the journal in which it was published. A paper can be withdrawn for any of a number of reasons.

38. Over the course of his more than 45-year career, Dr. Croce has withdrawn only two papers. The first was a Commentary Paper that Dr. Croce withdrew because the journal involved declined to include a sentence in the Commentary Paper that Dr. Croce believed needed to be included. Dr. Croce's direction to the journal was either to "include [his] comments on Cell or I withdraw the paper."

39. The second withdrawal occurred very recently, after the publication of the Defamatory Article and the filing of this lawsuit. It is the only research paper that Dr. Croce has ever withdrawn. It was published in 2008. The raw data upon which scientific research papers are based are normally required to be kept for at least six years. When questions were raised in

11

2017 about this eleven-year-old paper, not all of the raw data remained available to adequately respond to those questions.  The authors concluded, however, that 5 of the 43 subfigures in the paper  contained figure construction errors and therefore withdrew the paper.  None of those errors affected the scientific conclusions of the paper, which have been confirmed over many years in subsequent papers by other scientists.

### Retractions

40.     In scientific publishing, a "retraction" occurs when a journal removes a paper from the body of published work without regard to whether the authors consent.

41.     None of Dr. Croce's Research Papers has been retracted, nor have any of Dr. Croce's Review Papers been retracted.  Nor has any paper ever been retracted based upon, or prompted by, any contribution to that paper made by Dr. Croce or his laboratory.

42.     In his more than 45 years of scientific research, Dr. Croce has never committed or been found to have committed any scientific misconduct or fraud.

### Defendant Glanz' Trip To Columbus To Visit With Dr. Croce

43.     On September 14, 2016, Defendant Glanz, identifying himself as a reporter with the New York Times, sent an email to Dr. Croce stating:

> "Dear Prof. Croce, I am doing some reporting on promising anti-cancer results at a basic research level.  I am at the very beginning stages of the work and have the burden of a physical sciences background (Ph.D. in physics), but wonder if I could speak with you briefly on the fascinating topic of microRNA.  Thanks so much for considering this request.  Sincerely, Jim Glanz."

Prior to receiving this email, Dr. Croce did not know, had not met, and had never heard of James Glanz.  Unbeknownst to Dr. Croce and undisclosed to him by this email, Defendants intended at the time of Glanz' email to write an article portraying Dr. Croce as guilty of scientific misconduct, not an article about "promising anti-cancer results" or "the fascinating topic of

microRNA." Unaware of Glanz' ulterior motive for this visit, Dr. Croce invited Glanz to visit with Dr. Croce in Columbus and to tour Dr. Croce's lab at OSU.

44. Glanz arrived in Columbus on the evening of October 2, 2016. Dr. Croce went with Glanz to dinner and, on the following morning, welcomed Glanz to Dr. Croce's lab at OSU and took him on a tour of the lab. Because Dr. Croce believed that Glanz was interested in learning about the "fascinating topic of microRNA," Dr. Croce spoke to Glanz about microRNA and introduced Glanz to one of Dr. Croce's post-doctoral fellows, who also spent time telling Glanz about recent laboratory research. At no time during this visit to Columbus did Glanz ever mention anything to either Dr. Croce or the post-doctoral fellow about any scientific misconduct or "wrongdoing" by Dr. Croce.

45. On October 4, 2016, the day after Glanz visited Dr. Croce in Columbus, Glanz sent an email to Dr. Croce saying:

> Thanks again for inviting me to Columbus and spending so much time explaining the science to a novice in the area. I'll talk over the material with colleagues here and be in touch.

To this, Dr. Croce responded on the same day: "Dear Jim, I enjoyed meeting you! I hope you had a good time. Ciao, Carlo."

46. In the Defamatory Article, Glanz stated that "[d]uring [this] interview in October . . . Dr. Croce denied any wrongdoing, said he had been singled out in some of the accusations simply because he was a prominent figure, and largely placed the blame for any problems with figures or text on junior researchers or collaborators at other labs." This is false. During Glanz' interview with Dr. Croce in October, Glanz did not ask about or mention, to either Dr. Croce or his post-doctoral fellow, the topic of misconduct or "wrongdoing" by Dr. Croce.

47. In the Defamatory Article, Glanz also stated that Dr. Croce said "in a later statement" that "he had been singled out in some of the accusations simply because he was a

13

prominent figure." This also is false.  Dr. Croce never said in any later statement that "he had been singled out in some of the accusations simply because he was a prominent figure."

48.     Nor did Dr. Croce "in a later statement" say that "he placed the blame for any problems with figures or text on junior researchers or collaborators at other labs."  Instead, Dr. Croce said that, with respect to papers in which he was neither the first or last author, "the research described typically did not take place in his lab or under his supervision, and he did not participate in the task of writing the paper."  He stated that "[w]here the research and paper preparation are done in someone else's lab, Dr. Croce is limited in his ability to identify or correct errors . . .  [and] consistent with general practice in the industry, if the research was conducted in someone else's lab, Dr. Croce relies on that lab to prepare accurate figures."  These are statements of actual fact that do not "place blame" on anyone.

49.     On November 1, 2016, Glanz sent Dr. Croce an email saying "Prof. Croce, This note is a courtesy to let you know that the scope of our reporting has broadened, and I've made a few records requests at OSU and other institutions.  Sincerely, Jim."  Once again, there is not a word in this email from Glanz to Dr. Croce about any alleged wrongdoing or scientific misconduct by Dr. Croce.

**Defendant Glanz' Defamatory Letter**

50.     Three weeks later, on November 23, 2016, before Ohio State had even responded to Glanz' "few records requests," Glanz sent a letter on New York Times letterhead to OSU and to Dr. Croce stating that Glanz had questions he wanted to "put urgently" to Dr. Croce and OSU "as part of an article" Glanz was preparing.  Glanz' letter was six pages long, single-spaced, and contained twenty-five paragraphs.  Glanz sent that letter on behalf of and in the course and scope of his employment with NYTC.

14

51.     Disturbingly, Glanz' letter was riddled with false and defamatory statements about Dr. Croce and his career.  It also contained "questions," many of which were loaded, misleading, and/or based on false and defamatory premises.  A copy of Glanz' Letter is attached hereto and incorporated herein as Exhibit A (the "Defamatory Letter").  Dr. Croce was stunned to receive this letter from Glanz, especially in light of Glanz' prior representation that he was reporting on "promising anti-cancer results," and after hosting Glanz at OSU, conversing at dinner with him, and devoting the following day to hosting Glanz in his lab, without a single word from Glanz about any allegation of scientific misconduct or wrongdoing by Dr. Croce.

52.     Glanz also sent the Defamatory Letter to Dr. Croce's employer, OSU, which received the Defamatory Letter.

53.     The Defamatory Letter was a blatantly false attack on Dr. Croce's honesty and integrity as a scientist.  It contained statements of fact described below that are all defamatory and verifiably false.

54.     The Defamatory Letter states that, in the "observation" of Dr. David A. Sanders (an Associate Professor at Purdue University), "image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine."

55.     The statement that "image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine" is factually and verifiably false.  It is also defamatory because it tends to, and in fact does, injure him in his trade, profession, and occupation, as well as degrade and disgrace Dr. Croce, and hold him up to public hatred, contempt, and scorn.

56.     It is also factually false because, as Dr. Sanders himself now concedes, he did not have information sufficient to know whether Dr. Croce engaged in routine image fabrication,

duplication or mishandling, or plagiarism.  Therefore the assertion that Dr. Sanders made this "observation" is false.

57.     Dr. Sanders also now claims that some or all of the communications that are attributed to him in the Defamatory Letter were not made about Dr. Croce.  If Dr. Sanders did not make the statement that he "observed" that "image fabrication, duplication and mishandling, and plagiarism in Dr. Croce's papers is routine," then Defendants' statement that Dr. Sanders did so is false and defamatory.  If Dr. Sanders did make that statement, then Defendants are liable for republishing that false statement made by Dr. Sanders.

58.     The Defamatory Letter also states that "Dr. Croce is knowingly engaging in scientific misconduct and fraud."  In making this false statement of fact, Glanz republished another defamatory falsehood that Glanz claims was made by Dr. Sanders.  This statement is also factually and verifiably false.  Dr. Croce has never engaged in scientific misconduct or fraud.  It is also defamatory because it tends to, and in fact does, degrade and disgrace Dr. Croce, hold him up to public hatred, contempt, and scorn, and injure him in his trade, profession, and occupation.

59.     It is also factually false because, as Dr. Sanders himself now concedes, he did not have information sufficient to know whether Dr. Croce knowingly engaged in scientific misconduct and fraud.  Dr. Sanders has never met, never talked to, and never corresponded with Dr. Croce.  Dr. Sanders has never been in Dr. Croce's lab.  Dr. Croce had never heard of Dr. Sanders prior to receiving the Glanz Letter.

60.     Dr. Sanders also now claims that some or all of the communications that are attributed to him in the Defamatory Letter were not made about Dr. Croce.  If Dr. Sanders did not make this false and defamatory statement about Dr. Croce, then Defendants' statement that

Dr. Sanders did so is false and defamatory.  If Dr. Sanders did make that statement, then Defendants are liable for republishing that false statement made by Dr. Sanders.

61.     The Defamatory Letter also states that "Dr. Croce and the operation he oversees routinely handles [sic] experimental data improperly; routinely uses [sic] data duplicated from one experiment in figures for unrelated experiments; exercises [sic] little oversight when colleagues engage in those practices for papers on which Dr. Croce is an author; and routinely plagiarizes [sic] or allows to be plagiarized, text from papers written by other authors."  This also is a factual statement that is verifiably false.  Dr. Croce and the operation he oversees do not routinely handle experimental data improperly.  They do not routinely use data duplicated from one experiment in figures for unrelated experiments.  Dr. Croce's colleagues do not routinely "engage in those practices for papers on which Dr. Croce is an author."  Dr. Croce and the operation he oversees do not routinely plagiarize or allow to be plagiarized, text from papers written by other authors.  These statements are defamatory because they tend to, and in fact do, degrade and disgrace Dr. Croce, hold him up to public hatred, contempt, and scorn, and injure him in his trade, profession, and occupation.

62.     In the Defamatory Article, Defendant Glanz does not identify who made the statements quoted in Paragraph 61, above.  It is therefore unknown whether any person made them, or, if they were made, who made them.  If those statements were made by others than Defendant Glanz, then Defendants are liable for republishing them.  If they were not made by others, or if the statements twist the words of those who allegedly made them, then the statements are false and defamatory for that reason as well.

63.     The Defamatory Letter stated that "Dr. Croce reviewed and awarded countless grants using CTR money, often in cases with clear conflicts of interest involving grantees at his

own institution (Thomas Jefferson University at the time)."  This too is a factual statement that is verifiably false.  Dr. Croce did not review and award grants using CTR money involving grantees at his own institution at the time, Thomas Jefferson University.  To the contrary, in every case in which a grant application came up for discussion involving anyone from Thomas Jefferson University, Dr. Croce left the room, did not participate in the discussion on that application, and did not vote on it.  This statement is defamatory because it tends to, and in fact does, degrade and disgrace Dr. Croce, hold him up to public hatred, contempt, and scorn, and injure him in his trade, profession, and occupation.

64.     The Defamatory Letter stated that "[A]lmost none of the sweeping claims [Dr. Croce] and his research team initially made for the importance of the FHIT gene have stood the test of time.  It is not a trigger for all sorts of human cancers and its mutation may simply be a puzzling byproduct of cancer. Therefore, it is almost certainly not a promising route for therapeutics, as he told Ohio State officials when he was recruited to the university, according to minutes that are available online."  This is a factual statement that is verifiably false.  It also falsely accuses Dr. Croce of making a false representation to Ohio State officials when he was recruited to the University.  This statement is defamatory because it tends to, and in fact does, degrade and disgrace Dr. Croce, hold him up to public hatred, contempt, and scorn, and injure him in his trade, profession, and occupation.

65.     The fact that the FHIT gene is a tumor suppressor gene has been widely established, with respect to a wide range of human cancers, including lung, esophagus, colon, kidney, ovarian, cervical and breast cancers.  The FHIT gene continues to be an important focus in cancer research, as evidenced by the fact that, in the last eighteen months alone, at least twenty-one new papers involving FHIT have appeared on www.pubmed.gov, an online

repository of medical research and review papers maintained by the U.S. National Library of Medicine, National Institutes of Health.  Research involving the FHIT gene is conducted around the world, with recent papers from researchers in nations around the world, including, among others, the United States, China, Korea, Italy, Poland and Turkey.  The FHIT gene is also not a "puzzling byproduct of cancer," and the therapeutic promise of the FHIT gene is still significant.  As delivery methods of gene therapy improve, and as scientists are able to increase the effective delivery of gene therapies into cells, FHIT, as well as p53 and other known tumor suppressor genes, will be the focus of that therapy.

66.     The Defamatory Letter stated, "Finally, the paper Dr. Croce was required to retract or correct as part of the 'Alternative Resolution,' but did not, involved research on the FHIT gene. Was this refusal an attempt to cover up the almost complete failure of this line of research?"  The factual statement that is the premise of Glanz' question is that Dr. Croce's research on the FHIT gene was an "almost complete failure."  This is a statement of fact that is verifiably false and defamatory.  Many scientific papers from around the world continue to investigate the FHIT gene's operation and promise in tumor suppression.  Glanz' assertion that Dr. Croce interfered or failed to cooperate in the correction of errors in figure construction called for in an Alternative Resolution is likewise false.  Further, Dr. Croce was, appropriately, not required to retract any paper.

67.     All of the above statements reflect injuriously on Dr. Croce's reputation and expose him to public hatred, contempt, ridicule, shame or disgrace.  They also affect Dr. Croce adversely in his trade, business and profession.  They are all therefore defamatory per se.  They were also all published to Dr. Croce's employer.

68. Defendants are liable for these false and defamatory statements, whether or not they are alleged to have been made by others.

69. Defendants failed to act reasonably in attempting to discover the falsity or defamatory character of these statements before publishing them to Dr. Croce's employer. Defendants also published these false statements of fact to Dr. Croce's employer with knowledge that they were false or with reckless disregard of whether they were false or not.

70. The Defamatory Letter contained the following invitation to Dr. Croce and OSU: "If I can clarify any of these questions or provide further information, please let me know."

**Dr. Croce's Response to the Defamatory Letter**

71. In light of the maliciously false and defamatory statements and the loaded and misleading questions in the Glanz Letter coupled with Glanz' assertion that these questions are "put to you as part of an article I am preparing," Dr. Croce found it necessary to retain legal counsel to respond. On January 25, 2017, Dr. Croce responded (by means of a letter from his legal counsel) to each of the questions directed to Dr. Croce in the Glanz Letter ("Dr. Croce's Response," attached hereto as Exhibit B and incorporated herein by reference).

72. Dr. Croce's Response spelled out in detail facts that refuted the false and defamatory allegations in the Glanz Letter. Dr. Croce's Response also asked Glanz to provide information that Glanz claimed supported his defamatory statements in the letter. Dr. Croce's requests for that information were in response to Glanz' offer in the Defamatory Letter to provide that further information. Glanz did not respond to Dr. Croce's requests.

73. On January 26, 2017, Glanz sent an email to Dr. Croce's legal counsel asking two follow up questions. Dr. Croce responded to both questions through his counsel on January 27, 2017, and then stated this:

"Having fully responded to the allegations, false statements, and questions contained in the twenty five paragraphs in your letter, Dr. Croce would appreciate the following reciprocal courtesies from you. First, if you believe that anything contained in Dr. Croce's responses is inaccurate, please state, in a responsive email or letter directed to me, specifically and exactly what you contend is inaccurate and why you contend it is inaccurate. Second, please provide the information that Dr. Croce requested of you in the following paragraphs of my January 25, 2017, letter to you: paragraphs 1, 5, 7, 8, 11, 12, 14, 18, 22, and 25. We ask that you do these things before any article is published."

Glanz did not respond to this request either.

74. On March 2, 2017, Glanz sent another email to Dr. Croce's counsel containing additional "misconduct allegations." This email was also bereft of any information responsive to any of Dr. Croce's questions set forth in Dr. Croce's Response. On March 3, 2017, Dr. Croce (through his counsel) responded by email to Glanz' additional allegations of "misconduct," identifying and describing the evidence that refuted each one of them. The email concluded with the following repeated request:

Having now responded promptly to your requests for additional information, we ask you to respond to the requests I made of you back on January 25, 2017, letter. In response to your follow-up email dated January 26, I told you that:

"Having fully responded to the allegations, false statements, and questions contained in the twenty five paragraphs in your letter, Dr. Croce would appreciate the following reciprocal courtesies from you. **First**, if you believe that anything contained in Dr. Croce's responses is inaccurate, please state, in a responsive email or letter directed to me, specifically and exactly what you contend is inaccurate and why you contend it is inaccurate. **Second**, please provide the information that Dr. Croce requested of you in the following paragraphs of my January 25, 2017, letter to you: paragraphs 1, 5, 7, 8, 11, 12, 14, 18, 22, and 25. We ask that you do these things before any article is published."

To date, I have received no response from you to either of those requests. We reiterate those requests. Further, if you believe that anything contained in Dr. Croce's responses to these latest three issues that you ask about is inaccurate, please state, in a responsive email or letter directed to me, specifically and exactly what you contend is inaccurate and why you contend it is inaccurate. Given the deadline you imposed on our responses to you, please reciprocate on the same schedule. Thank you.

Once again, Glanz did not respond.

75.     Instead, five days later, on March 8, 2017, without having provided any of the further information that Dr. Croce had now three times requested from Glanz, Defendants published on the front page of the digital version of the New York Times an article replete with devastatingly false and defamatory statements about Dr. Croce which placed Dr. Croce before the public in a false light.  The article is attached hereto and incorporated herein as Exhibit C (hereinafter the "Defamatory Article").

**The Defamatory New York Times Article**

76.     The Defamatory Article first appeared in the digital version of The New York Times on March 8, 2017 under the headline: "Years of Ethics Charges, but Star Cancer Researcher Gets a Pass.  Dr. Carlo Croce was repeatedly cleared by Ohio State University, which reaped millions from his grants. Now, he faces new whistle-blower accusations."

77.     On that same day, the New York Times featured the article in both its Twitter feed and its Facebook page under the tag line "A star cancer researcher accused of fraud was repeatedly cleared by Ohio State, which reaps millions from his grants."  On March 8, 2017, Glanz also posted the article to his Twitter feed—twice.

78.     On March 9, 2017, the Defamatory Article was published on the front page of the New York Times' print version, above the fold, under the headline "Years of Questions but Researcher Gets a Pass."

79.     The March 8, 2017, digital version of the Defamatory Article was published to tens of millions of "unique visitors" in the United States and around the world.  The defamatory social media posts on Twitter and Facebook extended the reach of the digital version of the Defamatory Article still farther.  The New York Times reports that it has more than three million subscribers worldwide.

80.     Shortly after its publication, the New York Times reported that the Defamatory Article was Number One on the list of "Most Popular" articles in the digital version of The New York Times.  On the day of, and within days shortly thereafter, 444 readers had posted comments about it on the New York Times website.

81.     Defendants Glanz and Armendariz were identified as the authors of the Defamatory Article.  Defendants Glanz and Armendariz and all of the individuals who worked with them with regard to the Defamatory Article were acting in the course and scope of their employment by the NYTC.

82.     Defendant Sulzberger, Jr., as the publisher of the New York Times at the time the Defamatory Article was published, is individually liable to Dr. Croce for publishing the Defamatory Article in the New York Times.

83.     Defendant Baquet, as the executive editor of the New York Times, is also individually liable to Dr. Croce for publishing the Defamatory Article in the New York Times.

84.     Dr. Croce is not a public official.  Dr. Croce is a cancer research scientist who is known within his scientific discipline, but he has not achieved general fame or notoriety in the community, nor has he had pervasive involvement in the affairs of society.  Dr. Croce is therefore not a public figure.  Dr. Croce has not thrust himself to the forefront of any public controversies in order to influence the resolution of the issues involved.  Dr. Croce is therefore not a limited purpose public figure.  Upon information and belief, the vast majority of the people to whom the Defamatory Article was distributed did not know Dr. Croce and had never heard of him before.  Dr. Croce was a private figure at the time of the Defamatory Letter and Defamatory Article who had relinquished no part of his interest in the protection of his own good name.

85.     The Defamatory Article contains numerous false and defamatory statements of fact.  The cumulative import of all of those facts when read in the context of the entire article is also false and defamatory.  In addition, shortly after the publication of the Defamatory Article, Defendant Glanz made false and defamatory oral statements about Dr. Croce in an interview on radio station WOSU.

86.     Defendants knew that by publishing the Defamatory Article, the Defendants placed Dr. Croce in a false light that they knew would be highly offensive to a reasonable person.  Defendants knew and/or acted in reckless disregard of the falsity of the published matter and the false light in which Dr. Croce would be placed.

### Defendants' False and Defamatory Statements in the Defamatory Article, Social Media and WOSU Interview

87.     **False and Defamatory Statement Number 1.  The Headline**.  The headline of the digital version of the Defamatory Article states in large font and bold print:

### "Years of Ethics Charges, but Star Cancer Researcher Gets a Pass.  Dr. Carlo Croce was repeatedly cleared by Ohio State University, which reaped millions from his grants. Now, he faces new whistle-blower accusations."

This front page headline appears directly below the tag line "**Journalists on the ground. Stories grounded in facts**."

88.     The specific language that Dr. Croce has been the subject of "years of ethics charges" but "gets a pass" and was "repeatedly cleared by Ohio State University, which reaped millions from its grants" is capable of being reasonably construed, and was in fact reasonably construed, by reasonable readers of this headline and of the article as a whole as a statement of

fact that Dr. Croce has been guilty of repeated ethical violations but got away with them because of the millions of dollars in grants he has generated for OSU.

89.     The comments quoted in Paragraph 93, below, are all from actual reasonable readers who confirm that they reasonably understood the Defamatory Headline and the Defamatory Article as a whole to mean exactly that.

90.     Upon information and belief, the identity of some or all of the commenters quoted below is likely to be discoverable, for the following reasons:

    a.    All commenters (including those quoted below) are required to register with the New York Times, including providing their email addresses or social media profiles (on Facebook or Google).

    b.    Commenters who subscribe to the print edition of the New York Times (whether to the daily edition or to only the Sunday edition) will have provided their names and addresses (either home or business) to which the print edition is delivered.

    c.    Commenters who subscribe only to the online edition must provide payment information including their first and last names, their zip codes, and their email addresses.

    d.    All commenters who submit a comment to the New York Times for review and potential publication by the Times are required to submit with their comment a "display name" and their location.   The Times urges readers to use their real names as their "display name."   Upon information and belief, some who submitted comments to the Times for potential publication regarding the Defamatory Article submitted their real names.

e.   The New York Times makes clear to all that the names and contact information of commenters are not confidential.  The Times' published privacy policy informs subscribers, readers, and commenters that the Times may access, preserve and disclose personal information if required to do so by law or if the Times has a good faith belief that disclosure is necessary to "comply with the law or legal process."

91.   Upon information and belief, the vast majority of the comments submitted by readers in response to the Defamatory Article were reviewed and approved or rejected for publication by the New York Times.  The Times therefore, in fact, controlled what comments did or did not get published regarding the Defamatory Article.

92.   The Times states that it seeks articulate, well-informed comments that are relevant to its articles," and that it "treat[s] reader submissions like content."  The Times states that, to be approved for publication, the comments should avoid name-calling and "SHOUTING." "SHOUTING" occurs in comments when the commenter types some or all of the words in all capital letters.

93.   The following reader comments were posted online by reasonable readers of the Defamatory Article on the same day it was published or within a week thereafter.   Upon information and belief, all of these comments were reviewed and approved for publication by the New York Times before the Times published them.

a.   "Research frauds like Croce might explain why after billions are spent on cancer research, we have made only modest progress . . . Why isn't he in jail already? It's criminal. His grant money should be returned by Ohio State to the federal

government where it can be re-awarded to a bona fide researcher: "I suppose cancer research is such a lucrative business, it doesn't pay to find actual cures?"

b.    "While we otherwise believe that Academia always stands healthy and strong 'in the shoulder of Giants', dishonest work by people like Mr. Croce's [sic] silently spreads for years in the scientific community.  Millions have been wasted, and we will never know what findings were slowed down or prevented from happening in our lifetime."

c.    "THIS SHOULD BE RIGOROUSLY PROSECUTED BECAUSE TO DECEIVE ONE'S FELLOW SCIENTISTS WITH FALSE FACTS, AND TO STYMIE PROGRESS AND THE CURE OF DISEASES BY DISSEMINATING FABRICATIONS, DEMONSTRATES A GROTESQUE AND MALEVOLENT ATTITUDE TOWARDS ONE [sic] FELLOW MAN.  He, in a sense, committed a form of murder. He did not shoot anyone with a gun, but he led scientists astray, and these doctors spent precious hours examining his concoted [sic] falsehoods when they could have been finding actual cures. There is a body count."  (All capitalization—the "SHOUTING"—is in the original.)

d.    "Here's a scientist who turns out to be a crook and a liar and all the right-wing crazies come out to declare science itself has been refuted."

e.    "Stunning how many individuals and institutions have been complicit in obvious academic fraud.  An isolated incident one could shrug off. . . . What does it take for Ohio State University to fire this man? Afraid of losing grant money?  You can hire another geneticist with better credentials to replace this con man.  As a physician who graduated at the top of my medical school class after a

bioengineering degree from Columbia University, I have no idea how this man advanced his career without a PhD in the relevant field, let alone becoming chairman."

f.      "The Ohio State University has a penchant for the mercenary. It overlooks ethical issues as long as the money keeps flowing in."

g.      "Why can't the supposed adults in charge in Columbus realize that whatever they thought 'Carlo' was bringing to their campus has now been vastly outweighed by the negative publicity once the rock was finally lifted so the cockroach could scurry out?"

h.      "There's a glut of biomedical researchers in the US, certainly there's no need to rehab those found guilty of misconduct."

i.      "Peel back the curtains of what really happens in academic research, and you will find a boneyard of fraud. Winning/extending a grant is the primal driver.  . . .  Long story short - there are many more 'Dr. Croces' out there draining the NIH research gravy train that will never get caught."

j.      "Unfortunately, like too many other senior star researchers, he is a blowhard sales-person who has created a lab culture which rewards positive data at the expense of scientific method. Grad students and post-docs who do things properly and find negative results are pushed to the side. High-profile publications and grant money are the only thing that matters. In almost every field, there are some star scientists doing things properly, and making real contributions. And then there are people like this."

k.    "This man's fraudulent research has led to the approval and sale of pharmaceutical products, products which are presumably still on the market."

l.    "Good news, but the culture of fraud and especially abuse of power in the world of academic science research is breathtakingly widespread.  Because people like Croce are very successful, they infect the entire culture, and expecting to have people above you behave honestly is completely naive."

m.    "Science as practiced by Dr. Croce is incredibly corrosive.  Aside from slowing research in his own field, think of the effect he has on the general public's perception of scientific research, and how that changed perception can erode support for governmental funding for all types of research."

n.    "Carlo Croce is a disgrace to the institution and a fraud to science.  As an alumni, I feel disgust at how The Ohio State University has dealt with this man."  (This was a post on Facebook on March 8, 2017, that "shared" the Defamatory Article with others.)

o.    "Why look! Years of Ethics Charges, but Star #Cancer Researcher Gets a Pass even though proven guilty."  (This was a "retweet" on March 8 of The New York Times' post on Twitter of the Defamatory Article that day.)

94.    Upon information and belief all of these comments (with the exception of the last two – one posted on Facebook and the other in a "retweet") were reviewed and approved by Defendant NYTC before the New York Times published them.  Some of the reader comments violate Defendant NYTC's own guidelines for appropriate comments, including name-calling and SHOUTING.  Nonetheless, Defendants chose to, and did, publish them.

As the above comments and many others reveal, reasonable readers of both the headline and the content of the Defamatory Article reasonably understood them to mean that Dr. Croce was in fact guilty of "years of ethics charges" and was therefore a "con man," a "fraud," a "crook," a "liar," a "cockroach" that "scurried out from under a rock," a "murderer," and a scientist "guilty of misconduct." Those comments also reveal that reasonable readers understood the phrase "gets a pass" to mean that, although guilty, Dr. Croce was found not guilty because of the "millions" in grants he generates for OSU. This is the only reasonable meaning of the words in the context of the headline. Defendants intended to convey this false and defamatory meaning.

95. The text of the Defamatory Article builds upon and reinforces the defamatory meaning of the phrase "gets a pass." The Article asserts that the "primary burden for investigating and punishing misconduct falls to inherently conflicted arbiters: universities like Ohio State that stand to reap millions of dollars from the federal grants won by star researchers like Dr. Croce."

96. The Article says, "There's a terrible temptation to bury it all" because "there are dollars at stake," stating that OSU has received $8.7 million directly from Dr. Croce's grants.

97. The Article addresses two of Dr. Croce's papers that OSU found did not constitute research misconduct and, to link this finding to the theme that Dr. Croce is guilty of misconduct but gets away with it, Defendants place in a "pull quote," directly adjacent to that text, the repeated statement that "There's a terrible temptation to bury it all." A pull quote (also known as a lift-out pull quote) is a key phrase, quotation, or excerpt that has been pulled from an article and used as a graphic element, serving to entice readers into the article or to highlight a

key topic. It is typically placed (as this one was) in a larger or distinctive typeface and on the same page.

98.   The Article states that Dr. Sanders' students ask, upon being shown a figure in a Dr. Croce Research paper, "Why would these people get away with that?"

99.   The Article states that "despite the lashing criticisms of his work," Dr. Croce has "never been penalized for misconduct by federal oversight agencies or by Ohio State which has cleared him in at least five cases involving his work or the grant money he receives."

100.   The natural and obvious meaning of the above statements is that Dr. Croce is guilty of research misconduct and fraud, but has never been "penalized" for it, because OSU let him "get away with" it by "bury[ing] it all," so that OSU could continue to reap millions from Dr. Croce's grants.   This is the meaning that reasonable readers would and did, in fact, understand the headline and the Defamatory Article in its entirety to convey, as evidenced by the comments quoted above that were reviewed, approved, and published by The New York Times.

101.   Whether Dr. Croce was guilty or not guilty of any ethics charges, scientific misconduct or fraud is a statement of fact that is verifiable.   Dr. Croce was in fact not guilty of any of these.   He could not therefore have been "given a pass" for ethics charges, scientific misconduct or fraud that he did not commit.   The glaring and undeniable factual assertion in the headline and the cumulative factual import of the Defamatory Article in its entirety is that Dr. Croce has repeatedly and for years been guilty of "ethics charges," including data falsification, scientific misconduct and fraud, but OSU found him not guilty because it "reaped millions from his grants."   This is factually false.

102.   Defendants published False and Defamatory Statement No. 1 with knowledge that it was false and/or with reckless disregard of whether it was false or not.   Defendants knew and

31

recklessly disregarded the fact that Dr. Croce was not guilty of any ethics charges, scientific misconduct or fraud. Defendants also knew and recklessly disregarded the fact that OSU had not "given Dr. Croce a pass" for ethics violations, research misconduct, or fraud because OSU "reaped millions from his grants." Defendants therefore published False and Defamatory Statement No. 1 and the Defamatory Article with actual malice. Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 1 before publishing it and were therefore negligent in publishing it.

103. **False and Defamatory Statement Number 2.**

"**A star cancer researcher accused of fraud was repeatedly cleared by Ohio State, which reaps millions from his grants.**"

104. The New York Times "tweeted" this false and defamatory tagline on March 8, 2017, through its Twitter social media account, @nytimes, to all of The New York Times' Twitter "followers." The tweet included a link to the Defamatory Article. The New York Times has more than 35 million Twitter followers. The New York Times used this tag line again that same day to tout the Defamatory Article on its Facebook social media page, again linking to the Defamatory Article. The New York Times' Facebook page has nearly 14 million "likes" or followers. These social media posts by The New York Times are reasonably believed to have been shared within Twitter and Facebook thousands of times.

105. This tagline, read in the context of the Defamatory Article's headline and the Article as whole, is capable of being reasonably construed, and was in fact reasonably construed by reasonable readers, as a statement of fact that Dr. Croce committed fraud in the conduct of his cancer research, but was "repeatedly cleared" by Ohio State, not because he was innocent but because Ohio State "reaps millions from his grants."

106. Whether Dr. Croce was guilty or not guilty of fraud is a fact that is verifiable. Dr. Croce has, in fact, never committed fraud. The factual assertion in the tagline and throughout the article that Dr. Croce was guilty of fraud, but OSU found him not guilty because it "reaped millions from his grants," is verifiably false.

107. Defendants published False and Defamatory Statement No. 2 with knowledge that it was false and with reckless disregard of whether it was false or not. Defendants knew and recklessly disregarded the fact that Dr. Croce had never committed fraud and had never been found to have committed fraud. Defendants therefore published False and Defamatory Statement No. 2 and the Defamatory Article with actual malice. Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 2 before publishing it and were therefore negligent in publishing it.

108. **False and Defamatory Statement Number 3.**

"<u>Some scientists argue that Dr. Croce has overstated his expansive claims for the therapeutic promise of his work</u> and that his laboratory is focused more on churning out papers than on carefully assessing its experimental data."

109. This sentence contains two false and defamatory statements of fact. The first is False and Defamatory Statement No. 3 (underlined above) that "Dr. Croce overstated his expansive claims for the therapeutic promise of his work." This statement is capable of being reasonably construed, and was in fact reasonably construed, by reasonable readers to mean that that Dr. Croce falsely promotes the promise of his work in order to enhance his stature and his grants at the expense of the truth. This is a statement of fact that is verifiably false.

110. Whether Dr. Croce has overstated his claims for the therapeutic promise of his work is verifiable factually by comparing Dr. Croce's statements regarding the therapeutic

33

promise of his work with contemporaneous statements of other recognized experts about the therapeutic promise of that work.

111.    Dr. Croce's "work" includes the discovery of the BCL2 gene and the mechanisms of its activation in patients with chronic lymphocytic leukemia ("CLL").  The results were reported (by others than Dr. Croce) to "set the foundation for building towards the dream of cure for CLL."  Dr. Croce never overstated the value of this work.

112.    Dr. Croce's "work" includes his discovery of the FHIT gene.  Dr. Croce (and a collaborator, Dr. Kay Huebner) discovered the FHIT gene in 1995 and the Research Papers reporting the discovery were published in 1996.  In a February 23, 1996 newspaper article, Dr. Croce is quoted as having said the following about the FHIT gene discovery:

- "'We believe we have found the starting point of the most common human malignancies, including lung, esophagus and colon cancer,' said Dr. Carlo Croce, director of Jefferson's Kimmel Cancer Center;"

- "The investigators have so far related FHIT breakdowns to such tumors as nasopharyngeal, esophageal, stomach and colorectal carcinomas. But that may only be the starting point, said Croce. FHIT may also be involved in kidney, lung, ovarian, cervical and breast cancers."

113.    These were not "overstatements of the therapeutic promise of the FHIT gene" at the time these statements were made in 1996.  At that time, the discovery of the FHIT gene was considered by others than Dr. Croce to have even greater promise than this.  Dr. Marston Linehan of the National Cancer Institute stated: "They've hit upon the Rosetta stone of cancer study.  We are already tremendously impressed and excited to hear about it."  The FHIT gene has since proven to be a major tumor suppressor that is very frequently deleted in human malignancies, particularly in lung cancer.

114.    Dr. Croce's "work" also includes his discovery of the role of microRNAs in the development of cancer.  Dr. Croce did not overstate the therapeutic promise of this discovery

either.  For it, he was awarded InBev-Baillet Latour Fund International Health Prize (2013) described earlier.  Numerous distinguished scientists described the significance of the award.  One such scientist stated, "Croce's later discovery (2002) that the deletion of non-coding RNAs miR-15a and miR-16-1 were observed in numerous cases of CLL, and his determination that these two miRNAs target BCL2 mRNA for degradation, opened still another vista in cancer research, and interestingly, became his most highly cited work.  Prior to this, mutations affecting post-transcriptional regulatory processes had not been seriously considered as key drivers of oncogenesis. Now they are actively sought as such."

115.    Nor has Dr. Croce overstated the promise of any of the rest of his work. Defendants' statement to the contrary is false and defamatory.

116.    Defendants made False and Defamatory Statement No. 3 attributing it to "some scientists" without disclosing the facts upon which those purported "some scientists" based their statements, thus creating the reasonable inference that the statements are justified by the existence of unexpressed defamatory facts.

117.    In addition, because Defendants do not disclose the identities of those alleged "some scientists," it is impossible to know at this stage of the litigation whether any scientists actually said that Dr. Croce overstates the therapeutic promise of his work.  If no scientists said that, or Defendants twisted their words, then False and Defamatory Statement No. 3 is false and defamatory in this further respect.

118.    Defendants published False and Defamatory Statement No. 3 knowing that it was false and/or with reckless disregard of whether it was false or not.  Defendants therefore published False and Defamatory Statement No. 3 with actual malice.  Defendants also failed to

act reasonably in attempting to discover the truth or falsity of this statement before publishing it and were therefore negligent in publishing it.

119.    Defendants are liable for their republication of False and Defamatory Statement Number 3, whether or not they attribute it to "some [unnamed] scientists."

120.    **False and Defamatory Statement Number 4**.

"<u>Some scientists argue</u> that Dr. Croce has overstated his expansive claims for the therapeutic promise of his work and <u>that [Dr. Croce's] laboratory is focused more on churning out papers than on carefully assessing its experimental data.</u>"

121.    The second false and defamatory statement in the above-quoted paragraph is underlined above. Defendants' statement that "Dr. Croce's laboratory is focused more on churning out papers than on carefully assessing its experimental data" is a statement of fact that is verifiably false and defamatory. It is capable of being reasonably construed and was in fact construed by reasonable readers to mean that Dr. Croce "is focused more on churning out papers than on carefully assessing its experimental data."

122.    Dr. Croce's laboratory is not (and has never been) focused more on churning out papers than on carefully assessing its experimental data. The Defendants are liable for their republication of this false and defamatory factual statement whether or not they attribute it to "some [unnamed] scientists," who may or may not have said these things.

123.    The fact that Dr. Croce is not (and has never been) focused more on churning out papers than on carefully assessing experimental data is confirmed by the following facts:

a.      None of Dr. Croce's Research Papers has ever been the subject of any retraction.

b.      Fewer than 2% of Dr. Croce's Research Papers and fewer than 0.5% of the figures and sub-figures in Dr. Croce's Research Papers over 45 years have been the

subject of corrections to figures, and all of those corrections resulted from honest errors in figure construction.

c.  The scientific results of each of Dr. Croce's Research Papers that were the subject of a figure correction have been subsequently confirmed by other scientists in other laboratories.

d.  Dr. Croce consistently, repeatedly, and carefully assesses the experimental data produced in every experiment conducted in his laboratory before making the decision to prepare a Research Paper that publishes that data.

Defendants knew all of these facts at the time they published the Defamatory Article.

124.  Defendants further made False and Defamatory Statement No. 4 attributing it to "some scientists" without disclosing the facts upon which those purported "some scientists" based their statements, thus creating the reasonable inference that the statements are justified by the existence of unexpressed defamatory facts.

125.  In addition, because Defendants do not disclose who these alleged "some scientists" were, it is impossible to know at this stage of the litigation whether any scientists actually said that Dr. Croce's laboratory is focused more on churning out papers than on carefully assessing its experimental data.  If no scientists said that, or Defendants twisted their words, then False and Defamatory Statement No. 4 is false and defamatory in this further respect.

126.  Defendants published False and Defamatory Statement No. 4 with knowledge of its falsity and with reckless disregard for whether it was false or not.  Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in

attempting to discover the truth or falsity of False and Defamatory Statement No. 4 before republishing it and were therefore negligent in republishing it.

127.    **False and Defamatory Statement Number 5.**

"Since 2014, another critic, David A. Sanders, a virologist who teaches at Purdue University, has made claims of falsified data and plagiarism directly to scientific journals where more than 20 of Dr. Croce's papers have been published.  It's a 'reckless disregard for the truth,' Dr. Sanders said in an interview."

128.    Sanders' statement that Dr. Croce has a "reckless disregard for the truth" is a statement of fact that is verifiably false.  Dr. Croce does not disregard the truth at all, let alone recklessly disregard it.

129.    Dr. Croce's research and the research conducted in Dr. Croce's laboratory is in fact conducted carefully and with an unrelenting goal of seeking the scientific truth.  The facts that verify this include the following:

a.    Dr. Croce's scientific research has resulted in numerous path-breaking discoveries, described by other renowned scientists in his field as "nothing short of sensational," "field-expanding," and "merit[ing] generational fame";

b.    Dr. Croce's laboratory and the scientists who work in his laboratory are intent on insuring the accuracy of their scientific research;

c.    Fewer than 2% of Dr. Croce's Research Papers and fewer than 0.5% of the figures and sub-figures in Dr. Croce's Research Papers over 45 years have been the subject of figure corrections, and all of those corrections resulted from honest errors in figure construction;

d.      the research conclusions in all of Dr. Croce's papers that have been the subject of any figure corrections have been confirmed by other scientists at other institutions; and

e.      there has never been a finding of ethics violations, scientific misconduct or fraud against Dr. Croce.

130.    In addition, Dr. Sanders claims he did not make this statement about Dr. Croce generally.  Dr. Sanders also denies having sufficient knowledge or information to know whether Dr. Croce recklessly disregards the truth.  If Dr. Sanders did not make this statement about Dr. Croce, then the Defendants' assertion that Dr. Sanders made this statement is also false and defamatory for that reason, and Defendants knew it.  If Dr. Sanders did make this false and defamatory statement, then Defendants are liable for their republication of it.

131.    Defendants either published or republished False and Defamatory Statement No. 5 with knowledge that it was false and with reckless disregard of whether it was false or not. Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of Defamatory Statement No. 4 before publishing it and were therefore negligent in republishing it.

132.    **False and Defamatory Statement Number 6.**

"During an interview in October . . . Dr. Croce, 72, denied any wrongdoing, said he had been singled out in some of the accusations simply because he was a prominent figure."

133.    False and Defamatory Statement No. 6 is a statement of fact that is verifiably false.  No such discussion occurred.  During Glanz' interview with Dr. Croce and Dr. Croce's post-doctoral fellow in October, Glanz did not ask about or mention, to either Dr. Croce or to Dr.

Croce's post-doctoral fellow, the topic of misconduct or allegations of "wrongdoing" by Dr. Croce.

134.    Defendants published False and Defamatory Statement No. 6 with knowledge of its falsity and with reckless disregard of whether it was false or not.  Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 6.

135.    **False and Defamatory Statement Number 7.**

> "During an interview in October and in a later statement, Dr. Croce, 72, . . . largely placed the blame for any problems with figures or text on junior researchers or collaborators at other labs."

136.    False and Defamatory Statement No. 7 is a statement of fact that is verifiably false.  No such discussion occurred in the October interview with Dr. Croce.  During that interview Glanz did not ask about or mention the topic of misconduct or allegations of "wrongdoing" by Dr. Croce.  Nor did Dr. Croce "in a later statement . . . place the blame for any problems with figures or text on junior researchers or collaborators at other labs."

137.    Defendants published False and Defamatory Statement No. 7 with knowledge of its falsity and with reckless disregard of whether it was false or not.  Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 7.

138.    **False and Defamatory Statement Number 8.**

> "Even before his arrival at Ohio State in 2004, Dr. Croce had stepped beyond the generally expected bounds of cancer research.  In 1994, he joined the scientific advisory board of the Council for Tobacco Research, which the tobacco companies created to fight the public perception—supported by increasingly overwhelming scientific evidence—that smoking

caused cancer. Dr. Croce said in the interview and the statement that he had always believed that tobacco smoking caused cancer."

139.    It is true that in 1994 Dr. Croce joined the Scientific Advisory Board ("SAB") of the Council for Tobacco Research ("CTR"), on which he served until 1998.  But the statement that "Dr. Croce stepped beyond the generally expected bounds of cancer research" to do so is factually and verifiably false.  The words "stepped beyond" and "bounds" in this context mean to disregard a boundary.  There was no "generally expected" boundary "of cancer research" that precluded any scientist from joining the SAB.  This assertion in False and Defamatory Statement No. 8 is a statement of fact that is verifiably false.

140.    The falsity of Defamatory Statement No. 8 is demonstrated by the fact that Dr. Croce served as a member of the SAB from 1994 to 1998, together with other very distinguished scientists, many of whom were members of the National Academy of Sciences and/or the National Academy of Medicine (Institute of Medicine), including Raymond L. Erikson, Ph.D., Harvard University (a Member of the National Academy of Sciences ("NAS")); Gordon N. Gill, Ph.D., UCSD (a Member of the National Institute of Medicine (NAM, previously IOM)); Wolfgang K. Joklik, Ph.D., a Member of NAS; Henry T. Lynch, M.D. (the discoverer of the Lynch Syndrome); Judith L. Swain, M.D., UCSD, a Member of NAM; and Peter K. Vogt, Ph.D., Scripps Institute, a Member of NAS and NAM.  Dr. Croce replaced Dr. Alfred Knudson, one of the most distinguished cancer scientists in the Nation, on the committee.

141.    The falsity of Defamatory Statement No. 8 is further demonstrated by the fact that esteemed academic institutions and cancer research scientists continued through all of those years to apply for grants from the SAB and accept grant money from the CTR for cancer research.  Those institutions included Harvard University Medical School, Yale University

School of Medicine, Johns Hopkins University Medical Institutions, M.D. Anderson Cancer Center, Cornell University Medical College, Johnson Comprehensive Cancer Center at UCLA, Howard University, University of Texas, Baylor College, University of California (Berkeley), and University of Kansas, to name just a few.

142.    None of these distinguished scientists would have agreed to serve on the SAB, and none of these renowned academic institutions would have accepted grant money from the CTR, if doing so "stepped beyond the generally expected bounds of cancer research."

143.    That these distinguished scientists all agreed to serve on the SAB and that these renowned academic institutions accepted grant money from the CTR proves that, during the years Dr. Croce served on the SAB, there were no "generally expected bounds of cancer research" that precluded any cancer researcher from serving on the SAB or that precluded any academic institution from accepting grant money from the CTR.  Dr. Croce therefore did not "step beyond" the imaginary "bounds of cancer research" by serving on the SAB from 1994-1998.

144.    It was not until July 1, 2004 (long after Dr. Croce had left the SAB) that Harvard University Medical School instituted a policy to prohibit the acceptance of funding for research or other purposes from companies that make or market tobacco products or from entities supported by such companies, stating that, even then, there were "persuasive arguments on both sides of the question" of whether to accept such funding, and "that prohibiting such funding has the potential of depriving researchers and society of a funding source for addressing important non-tobacco related research questions."

145.    Nor did any research papers published as a result of the SAB's funding recommendations go beyond any generally expected bounds of cancer research.  To the contrary,

to qualify for publication in any of the leading public health and other scientific journals, the research papers had to be (and were) peer reviewed and approved for publication by experts in the field who had no connection to the CTR. These peer reviewers would not approve and the journals did not and would not publish articles that promote false scientific theories of smoking and disease. Instead, to pass peer review and win the competition for limited space in those scientific journals, those papers had to (and did) contribute in a meaningful way to advancement of scientific knowledge.

146. As Defendants knew, the truth is that Dr. Croce served on the SAB because the CTR was a large source of funding for worthy and important scientific research at a time when financial support for cancer research was very much needed. Dr. Croce was obviously not alone.

147. Defendants knew all of these facts at the time they published the Defamatory Article. Defendants knew that Dr. Croce had not "stepped beyond the generally expected bounds of cancer research" by joining the SAB. Defendants published False and Defamatory Statement No. 8 with knowledge of its falsity and with reckless disregard for whether it was false or not. Defendants therefore published the statement with actual malice. Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 8 before publishing it and were therefore negligent in publishing it.

148. **False and Defamatory Statement Number 9.**

> "Dr. Croce, who has a medical degree but no Ph.D., showed his own willingness to buck scientific consensus when he became an adviser to the Council for Tobacco Research."

149. Read in context, the "scientific consensus" to which False and Defamatory Statement No. 9 refers is the "increasingly overwhelming scientific evidence that smoking causes cancer." False and Defamatory Statement No. 9 states as a fact that Dr. Croce was

43

willing to "buck" that "scientific consensus" by "becoming an adviser to the CTR." The word "buck" as used in this context means to a reasonable reader "to act contrary to." False and Defamatory Statement No. 9 is a statement of fact that is verifiably false.

150.    Dr. Croce never "buck[ed] the scientific consensus" that smoking causes cancer. To the contrary, in 1995, Dr. Croce (and his collaborator Dr. Huebner) discovered that the FHIT gene is the target of carcinogens including tobacco smoke. In April 1996, while on the SAB, Drs. Croce and Huebner published a research paper in the journal *Cell*, stating:

> "Owing to its etiology, lung cancer is likely to be strongly and directly associated with the effects of agents that interfere with DNA replication, such as agents in tobacco smoke."

151.    In 1997, while Dr. Croce was still on the SAB, his paper entitled "Association between Cigarette Smoking and FHIT Gene Alterations in Lung Cancer" (Cancer Research 57, 2121-2123, June 1, 1997) was published. That paper stated:

> "Epidemiologic data have strongly indicated that cigarette smoking is linked to the development of lung cancer" and that "smoking is recognized as a major cause of cancer-related death worldwide. Lung cancer, which represents the most common tumor type in men, is directly associated with tobacco smoking."

Because (as the paper noted) "little [was] known of the molecular targets of carcinogens contained in tobacco smoke," Dr. Croce's research investigated that question and found a statistically significant association between cigarette smoking and alterations in the FHIT gene. The paper reports the results of Dr. Croce's investigation.

152.    Defendants knew all of these facts at the time they published the Defamatory Article. Defendants knew that Dr. Croce did not "buck scientific consensus" when he became a member of the SAB. Defendants published False and Defamatory Statement No. 9 with knowledge of its falsity and with reckless disregard for whether it was false or not. Defendants therefore published the statement with actual malice. Defendants also failed to act reasonably in

44

attempting to discover the truth or falsity of False and Defamatory Statement No. 9 before publishing it and were therefore negligent in publishing it.

153.    **False and Defamatory Statement Number 10.**

"Some of the research Dr. Croce pioneered in those years [1994-1998 while he was on the SAB] was used by the tobacco industry to fight the assertion that smoking caused cancer."

154.    False and Defamatory Statement No. 10 read in context asserts that Dr. Croce's research actually supported the tobacco industry's "fight" against the "assertion that tobacco caused cancer," and that Dr. Croce was therefore complicit with the tobacco industry in fighting that assertion.  This is a statement of fact that is verifiably false.

155.    The "some of the research" to which Defendants refer is the Research Paper that reports the discovery of the FHIT gene.   This Research Paper did not support the tobacco industry's fight against the assertion that smoking caused cancer.   The paper said just the opposite.

156.    Defendants knew that the research to which False and Defamatory Statement No. 10 refers stated that lung cancer is strongly and directly associated with tobacco smoke. Defendants knew that fact because Dr. Croce told them in his Response to Glanz' Defamatory Letter.   Dr. Croce also provided Defendants with the citation to the actual Research Paper. Defendants published False and Defamatory Statement No. 10 while knowing that its imputation that Dr. Croce's research supported the tobacco industry was false.  Defendants also published False and Defamatory Statement No. 10 with reckless disregard for whether it was false or not. Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 10 before publishing it and were therefore negligent in publishing it.

157.    Defendants also knew at the time they published the Defamatory Article that the FHIT gene was used by Plaintiffs' expert witnesses in the tobacco litigation against the tobacco industry, as evidence that smoking causes cancer.  However, Defendants conveniently omitted this known fact from their Article, intentionally creating the misleading impression that Dr. Croce's work discovering the FHIT gene helped the tobacco industry, when the true facts show that FHIT was actually used against the tobacco industry.

158.    **False and Defamatory Statement Number 11.**

> [F]or the [tobacco] industry, it wouldn't have mattered, said William Farone, once a scientist for the tobacco industry who has repeatedly testified against it. "He knows damn well what use of the genetic information there would be to someone in the tobacco industry," Dr. Farone said.

159.    The "it" in the first line of the above quote refers to the fact that "Dr. Croce was careful to point out in his scientific papers that carcinogens in cigarette smoke could in fact be the agents that damaged the FHIT gene."  The false statement of fact is that Dr. Croce "knows damn well what use of the genetic information there would be to someone in the tobacco industry."  Dr. Croce did not know that the tobacco industry would attempt to "use" the Research Papers published while he was on the SAB, which explicitly stated that tobacco smoke causes cancer, to argue the exact opposite.

160.    This false statement of fact is particularly pernicious because it suggests that Dr. Croce should not have conducted groundbreaking scientific research establishing that the carcinogens in tobacco smoke cause alterations in the FHIT gene, thereby causing cancer, for fear that the tobacco industry might misuse this "genetic information."

161.    Defendants are liable for their republication of Farone's false and defamatory statement of fact whether or not they attribute that statement to Farone.

46

162.     Defendants published False and Defamatory Statement of Fact No. 11 knowing that it is false.  Defendants published False and Defamatory Statement of Fact No. 11 with reckless disregard for whether it was true or false.  Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 11 before publishing it and were therefore negligent in republishing it.

163.     Read in context, False and Defamatory Statements Nos. 8 through 11 have nothing whatsoever to do with any alleged "inherent conflict" when universities "investigate" allegations of misconduct by "star researchers" like Dr. Croce, who generate "millions" in grants for the university.  They do not address research misconduct at all.  They are instead false statements of fact that disparage and attack Dr. Croce's integrity, his character, and personal morality with the assertion that, even though Dr. Croce always believed smoking was the primary cause of lung cancer, he acted to help the tobacco industry by conducting research that he knew "damn well" would be "used by the tobacco industry to fight the assertion that smoking caused cancer."

164.     These outrageously false and defamatory factual allegations that Dr. Croce colluded with the tobacco industry could have only one purpose relevant to the Defamatory Article – to reinforce Defendants' false and defamatory assertion that Dr. Croce is a corrupt and dishonest scientist.

165.     **False and Defamatory Statement Number 12**.

> "After receiving several tips on Dr. Croce's work, Dr. Sanders said, he decided to undertake yet another moonlighting effort: as a 'freelance ethicist.' 'A lab that is engaging in violating scientific norms is being rewarded for that very effort,' he said."

47

166.    The statement that Dr. Croce or his laboratory is "engaging in violating scientific norms" and "being rewarded for that very effort" is a factual statement that is defamatory and verifiably false.

167.    It is also factually false because, as Dr. Sanders himself now concedes, he did not have information sufficient to know whether Dr. Croce has committed research misconduct or whether Dr. Croce or his lab has been rewarded for violating scientific norms.

168.    Dr. Sanders also now claims that some or all of the communications that are attributed to him in the Defamatory Letter were not made about Dr. Croce.  If Dr. Sanders did not say that Dr. Croce or his lab is "engaging in violating scientific norms [and] is being rewarded for that very effort," then Defendants' statement that Dr. Sanders did so is false and defamatory.  If Dr. Sanders did make that statement, then Defendants are liable for republishing that false statement made by Dr. Sanders.

169.    The "scientific norms" for honest and accurate reporting of the results of scientific research are set forth in the "Federal Policy on Research Misconduct."  The Federal Policy on Research Misconduct is administered by the Federal Office of Research Integrity ("ORI"), which is an office within the United States Department of Health and Human Services.

170.    The Federal Policy on Research Misconduct is published in the Federal Register and is revised periodically.  The policy applicable to any specific allegation of scientific misconduct is the policy in effect at the time the paper in question is published.  The Federal Policy on Research Misconduct's definition of research misconduct expressly states that "Research misconduct does not include honest error or differences of opinion."  Nor is it a violation of any alleged "scientific norm" to make an honest error in assembling a figure in a

scientific paper, as has happened in fewer than 0.5% of the more than 5,000 figures in Dr. Croce's Research Papers.

171.    Dr. Croce has never committed research misconduct, and has never been found to have committed research misconduct.  Nor has he or his laboratory violated any "scientific norm," let alone been rewarded for having done so.

172.    Defendants published False and Defamatory Statement No. 12 knowing that it was false and with reckless disregard for whether it was true or false.  Defendants therefore published the statement with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 12 before publishing it and were therefore negligent in republishing it.

173.    Defendants are liable for their republication of Sanders's false and defamatory statement of fact whether or not they attribute that statement to Sanders.

174.    **False and Defamatory Statement Number 13**.

"Mindful of the hurdles that an investigation would face at Ohio State, as well as federal constraints like a six-year statute of limitations, Dr. Dahlberg trimmed Clare Francis' initial list of allegations to the two he considered the most actionable."

175.    The "allegations" to which False and Defamatory Statement No. 13 refers are the "more than 30 papers" on which allegations were made by an anonymous person, whom Defendants describe as a "scientific gadfly," who goes by the pseudonym "Clare Francis."  Dr. Dahlberg was the Deputy Director of ORI at the time those anonymous allegations were made.

176.    False and Defamatory Statement No. 13's assertion that ORI trimmed Clare Francis' initial list of allegations to the two it considered the "most actionable" is false.  The term "actionable" means "subject to or affording ground for an action or suit at law" or "capable of being acted on." False and Defamatory Statement No. 13 asserts that two of the allegations were

the "most actionable," meaning that others were also "actionable" but less so.  This is false.  ORI determined that only the two it referred to OSU were even potentially "actionable."

177.  Defendants' assertion that ORI, when determining whether an inquiry by OSU was warranted, considered "the hurdles that an investigation would face at OSU" is also false. The considerations that bear on ORI's determination of what allegations to refer to an institution are dictated by statute, and they do not involve considering "hurdles that an investigation would face" at the institution.  Consistent with law, ORI referred to OSU all allegations that warranted any inquiry by OSU under the relevant statute.

178.  The truth is that ORI reviewed all of the allegations and made the following determinations:

    a.    ORI determined that some of allegations related to papers published more than six years previously and were therefore not actionable.

    b.    ORI determined that a number of papers related to work that took place outside of the United States and that those were therefore not actionable.

    c.    ORI analyzed all the remaining papers using ORI's own sophisticated image analysis tools and determined that all but two of them merited no further review.

    d.    As to those two, ORI made no determination that they were actionable, but only referred them to OSU for further review.

Thus it is false to state that the two referred were the "most actionable."  The allegations that ORI did not refer to OSU were not actionable at all.

179.  ORI's referral of the two allegations was not because they were "actionable." They were referred only for further review.  It is also false to state that ORI made decisions

based in any manner on "the hurdles that an investigation would face at OSU," when it did not. It is further false to imply, as Defendant do, that but for ORI's consideration of the hurdles an investigation would face at OSU, it would have found that other allegations also warranted an inquiry.  Defendants knew their statements falsely implied, and they intended to falsely imply, that other allegations also warranted inquiry, but that ORI did not refer them, in part because of ORI's perception of "hurdles that an investigation would face at OSU."

180.    Defendants also falsely state that, as to the two referred allegations, ORI merely "accepted the result" reached by OSU and imply as fact that ORI gave in reluctantly to a determination by OSU with which ORI did not agree.  This also is factually false.  ORI agreed with OSU that there was insufficient evidence to proceed to an inquiry in the matter.  ORI also agreed with OSU's conclusion that the labeling and duplication of bands in the two publications appeared to be the result of honest error.  ORI concluded that OSU acted appropriately, and closed its case without further action.

181.    Defendants published False and Defamatory Statement No. 13 knowing that it was false.  Defendants published False and Defamatory Statement No. 13 with reckless disregard for whether it was true or false.  Defendants therefore published the statement with actual malice. Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 13 before publishing it and were therefore negligent in publishing it.

182.    **False and Defamatory Statement Number 14.**

"As a result of complaints by Dr. Sanders and others [of "data falsification, other scientific misconduct, and plagiarism"], journals have been posting notices of problems with Dr. Croce's papers at a quickening pace. From just a handful of notices before 2013 — known as corrections, retractions and editors' notices — the number has ballooned to at least 20, with at least three more on the way, according to journal editors.  Many of the notices involve the improper

manipulation of a humble but universal lab technique called western blotting….”

183.    Placed in context, False and Defamatory Statement No. 14 appears in the fourth

of the following four consecutive paragraphs near the beginning of the Defamatory Article.

“Over the last several years, Dr. Croce has been fending off a tide of allegations of data falsification and other scientific misconduct, according to federal and state records, whistle-blower complaints and correspondence with scientific journals obtained by The New York Times.

In 2013, an anonymous critic contacted Ohio State and the federal authorities with allegations of falsified data in more than 30 of Dr. Croce’s papers. Since 2014, another critic, David A. Sanders, a virologist who teaches at Purdue University, has made claims of falsified data and plagiarism directly to scientific journals where more than 20 of Dr. Croce’s papers have been published.

“It’s a reckless disregard for the truth,” Dr. Sanders said in an interview.

As a result of complaints by Dr. Sanders and others, journals have been posting notices of problems with Dr. Croce’s papers at a quickening pace. From just a handful of notices before 2013 — known as corrections, retractions and editors’ notices — the number has ballooned to at least 20, with at least three more on the way, according to journal editors. Many of the notices involve the improper manipulation of a humble but universal lab technique called western blotting, which measures gene function in a cell and often indicates whether an experiment has succeeded or failed.”

184.    To reasonable readers, the phrase “Dr. Croce’s papers” is reasonably construed,

and was in fact reasonably construed, to mean papers that report research conducted by Dr.

Croce (or, at the very least, by others in Dr. Croce’s laboratory under his supervision).  This is

confirmed by the comments of those actual readers condemning “*this man’s* fraudulent

research,” “*science as practiced by Dr. Croce,*” and “*dishonest work by people like Mr. Croce.*”

185.     Read in context, False and Defamatory Statement No. 14 is reasonably construed, and was in fact construed by reasonable readers, to mean that the "corrections, retractions and editors' notices" referenced were necessary as a result of data falsification and other scientific misconduct by Dr. Croce.  This meaning is conveyed by the fact that the fourth paragraph begins with the lead-in phrase "*As a result of complaints by Dr. Sanders and others*," corrections, retractions, and editors' notices in "Dr. Croce's papers" have "ballooned to at least 20." (Emphasis added.)  The *only* "complaints" that "Dr. Sanders and others" are said in the Article to have made are allegations of "data falsification," "other scientific misconduct," and "plagiarism."   Defendants also falsely state that "[m]any of the notices" resulted from the "improper manipulation" of a "lab technique."   The only reasonable meaning of False and Defamatory Statement No. 14, when read in context, is that Dr. Croce's research has been retracted, corrected and subject to editors' notices due to data falsification and other scientific misconduct by Dr. Croce.

186.     False and Defamatory Statement No. 14 is a verifiably false statement of fact.  No papers reporting Dr. Croce's research have ever been retracted, corrected, or subject to editors' notices due to data falsification or any other scientific misconduct by Dr. Croce, and Dr. Croce has never engaged in data falsification or scientific misconduct.

187.     False and Defamatory Statement No. 14 is also verifiably false and defamatory because it implies to the reasonable reader that a "correction" or "editor's notice" with regard to a scientific paper means that it has been found to contain "falsified data, scientific misconduct, or plagiarism."   This is factually false, and Defendants knew it was false at the time they published the Defamatory Article.

188.    Neither a correction nor an editors' notice is evidence of, or constitutes a finding of, data falsification, scientific misconduct, or plagiarism.   No paper reporting Dr. Croce's research or research conducted in Dr. Croce's laboratory has ever been retracted.   Defendants knew this fact at the time they published the Defamatory Article.

189.    False and Defamatory Statement No. 14 asserts that "complaints" of data falsification, other scientific misconduct, and plagiarism have been submitted to scientific journals by "Dr. Sanders and others."   The use of the plural pronoun "others" is capable of being reasonably construed to mean that two or more persons in addition to Dr. Sanders submitted such complaints to journals.

190.    The only "person" (other than Dr. Sanders) identified in the Defamatory Article as having submitted such complaints to journals is "Clare Frances."   Upon information and belief, the only complaints submitted to journals alleging data falsification were submitted by Dr. Sanders and "Clare Frances."   But, "Clare Frances" is a pseudonym for an anonymous person or persons.   If the anonymous "Clare Frances" is only one person, then the use of the term "others" is false.   If David Sanders is the person making complaints under the pseudonym "Clare Frances," then the use of the term "others" is also false.   If either of those cases prove true, then Defendants' factual statement that complaints have been submitted to scientific journals by Dr. Sanders "and others" is false and defamatory.

191.    Defendants' assertion that "[m]any of the notices involve the improper manipulation of a humble but universal lab technique called western blotting" is verifiably false. Defendants used the words "improper" and "manipulation" intentionally to communicate that some intentional wrongdoing occurred.   Dr. Croce has never improperly manipulated a lab technique called western blotting.   To the extent any of the corrections of Dr. Croce's Research

Papers involved western blots, the corrections were necessary to correct inadvertent errors in figure construction, involved no intentional wrongdoing, and had no effect on the scientific conclusions presented.

192.    Defendants published False and Defamatory Statement No. 14 with knowledge that it was false and with reckless disregard of whether it was false or not.  Defendants therefore published False and Defamatory Statement No. 14 with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 14 before publishing it and were therefore negligent in publishing it.

193.    **False and Defamatory Statement Number 15.**  The Defamatory Article, with all of the False and Defamatory Statements contained in it, when read in context and as a whole, is capable of being reasonably construed, and was in fact reasonably construed, by reasonable readers to mean that Dr. Croce has for years been guilty of repeated data falsification, scientific misconduct and fraud, but got away with it because of the millions of dollars in grants he has generated for OSU.  This is factually false and devastatingly defamatory.

194.    That reasonable readers in fact understood the Defamatory Article to communicate this defamatory meaning is confirmed by the comments of reasonable readers that Dr. Croce "deceive[d] fellow scientists with false facts," "stymie[d] progress and the cure of diseases," "led scientists astray," "concoted [sic] falsehoods when they could have been finding actual cures," engaged in "dishonest work [that] spreads for years in the scientific community," and is a "fraud to science."  Defendants knew at the time that they published the Defamatory Article that this meaning that they intended to communicate was both false and defamatory.

195.    Defendants featured prominently in the Defamatory Article a figure contained in one of Dr. Croce's Research Papers, which had been published in 2005.  That particular figure

was the subject of a question first raised eight years later, in 2013, concerning whether an error had been made in the construction of the figure for publication.  Experts disagreed as to whether an error had been made.  Because of the passage of many years, the raw data was no longer available to verify whether an error had been made.

196.    However, the experiment was repeated in 2014 by the first author, and the same results were obtained.  In addition, after the Research Paper in question was published in 2005, and before the figure was challenged in 2013, other researchers had confirmed and reported in published Research Papers the same results.  Defendants knew these facts before they published the Defamatory Article, because Dr. Croce told them these facts in his Response to the Defamatory Letter.

197.    Despite their knowledge of these facts, Defendants featured prominently in the Defamatory Article an image that Defendants knew reported scientific results that were in fact confirmed by subsequent experiments and Research Papers, by the first author of that paper and by others.

198.    Defendants in fact had, in their possession at the time the Defamatory Article was published, the replicate experiment showing that the experimental results reflected in that corrected image were true and accurate.  Defendants also had citations to the other Research Papers confirming the scientific conclusions reported in that image.

199.    Defendants thus knew that any error in construction of the control portion of the figure Defendants so prominently relied on in the Defamatory Article had absolutely no effect on the scientific results reported in that image and in that paper.  They also therefore knew that the authors of that paper did not, and had no motive to, misrepresent the results.  Despite this

knowledge, Defendants intentionally and falsely communicated to their readers that the scientific conclusions of that paper are false.

200.    Defendants published False and Defamatory Statement No. 15 with knowledge that it was false and with reckless disregard of whether it was false or not.  Defendants therefore published False and Defamatory Statement No. 15 with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 15 before publishing it and were therefore negligent in publishing it.

201.    **False and Defamatory Statement Number 16.    Glanz' WOSU Radio Interview.**  On March 9, 2017, Defendant Glanz was interviewed by WOSU Radio.  Defendant Glanz gave that interview in the course and scope of his employment by The New York Times.  A transcript of the interview is attached hereto and incorporated herein as Exhibit D.  The first question the interviewer asked Defendant Glanz, was "what are the basic allegations against Dr. Croce?"  (Exhibit D at 2:18-20)  Defendant Glanz answered:

> "Well, the allegations are that in the lab he oversees and on papers which he is co-author, there are -- call them <u>fabricated figures</u>, they're <u>duplications of data from unrelated experiments used to prove a point you know in another experimen</u>t, I think <u>that's probably at the center of things</u> and then there were some other ethics charges including plagiarism uh and uh misappropriation of grant money and things like that <u>but it's really the data manipulation that's at the center of the allegations</u>."

*Id.* at 2:21-24, 3:1-7.  (Emphasis added)

202.    Defendant Glanz' statement that the lab that Dr. Croce oversees "fabricate[s] figures" by using "duplications of data from unrelated experiments" to "prove a point in another experiment" is a statement of fact that is verifiably false and defamatory.  The phrase "to prove a point" can only be reasonably understood to mean that Dr. Croce deliberately "used" data from "unrelated experiments" to prove a point in another experiment, thus intentionally fabricating the results of his scientific research.

203.    This is confirmed by the radio interviewer's immediate and reasonable reaction that these are "certainly a lot of very damning allegations for a researcher." *Id.* at 3:8-9.

204.    Defendant Glanz' statement was indeed damning.  It was also defamatory and false.  Neither Dr. Croce nor any person in his laboratory has ever used duplications of data from one experiment for the purpose of proving a point in another experiment.  Neither Dr. Croce nor any person in his laboratory has ever made up scientific research results.

205.    The WOSU radio interviewer observed that the Defamatory Article "seems to imply" that the allegations against Dr. Croce in the Defamatory Article are "worse than" just "honest errors," saying "that's why [the Times] wrote the article, right?"  This question (which Defendant Glanz did not answer) confirms that the WOSU interviewer, like the commenters, understood the Defamatory Article to accuse Dr. Croce of intentionally fabricating scientific evidence.

206.    The WOSU interviewer then asked whether any errors in the preparation of figures for publication could "be explained by just normal academic mistakes?"  Defendant Glanz reframed the question as one of "intent" -- "did they mean to do it?"  Defendant Glanz' own answer to that question was that Defendants were "satisfied" that the "image manipulation" was "part of a pattern." *Id.* at 5:10-23.  Defendant Glanz' statements in the radio interview are reasonably construed to mean that Dr. Croce deliberately fabricated and manipulated scientific data, and Glanz intended to convey that meaning.  Defendants knew this was false.  Defendants knew at the time that Defendant Glanz made False and Defamatory Statement No. 16 that neither Dr. Croce nor his laboratory had duplicated data from unrelated experiments for the purpose of proving a point in another experiment.

207.    Defendants knew that the correction of fewer than 20 sub-figures out of more than 5,000 published sub-figures is not evidence of a "pattern" that would even suggest any intentional manipulation of scientific results by Dr. Croce.

208.    Defendants knew that none of the very few honest errors that resulted in corrections altered the scientific conclusions of any of Dr. Croce's Research Papers and that, therefore, there was absolutely no motive or reason to falsify any figure.

209.    Defendants knew that the few figure errors in Dr. Croce's Research Papers were not fabricated "to prove a point" in that or any "unrelated experiment."

210.    Defendants published False and Defamatory Statement No. 16 with knowledge that it was false and with reckless disregard of whether it was false or not.  Defendants therefore published False and Defamatory Statement No. 16 with actual malice.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of False and Defamatory Statement No. 16 before publishing it and were therefore negligent in publishing it.

**The General Context of Defendants' False and Defamatory Statements of Fact.**

211.    The general context of the Defamatory Article as a whole confirms that False and Defamatory Statement Numbers 1 through 16 are statements of fact.

212.    The Defamatory Article in the digital edition appears directly below a box containing the tag line "**Journalists on the ground.  Stories grounded in facts**."

213.    The Defamatory Article uses words clearly indicating that it is purporting to report facts.  It uses the words "investigation" or "investigating" nine times; "findings" nine times; and "evidence" six times.  By contrast, it contains the word "opinion" only once, in connection with statements allegedly made by Randy Schekman and Phillip Sharp.

214.     Defendant Glanz' name at the top of the digital publication of the Defamatory Article is hyperlinked to his profile on the New York Times website, where he is described as a "reporter on the Investigations desk."  Glanz' name as it appears at the bottom of the Defamatory Article is hyperlinked to his Twitter profile, where he is also described as an "Investigative journalist."

215.     The general context of the Defamatory Article supports the reasonable readers' understanding that Dr. Croce had in fact been repeatedly guilty of research misconduct, fraud, and ethics violations and got away with them because OSU "reaped millions" from his grants. All of these facts are false.

216.     The Defamatory Article goes out of its way to assassinate Dr. Croce's character and integrity with its false and defamatory assertions of collusion with the tobacco industry "to fight the assertion that smoking caused cancer," all to support its false factual premise that Dr. Croce is a dishonest scientist.

217.     Read in its entirety, the Defamatory Article tells readers that Dr. Croce is the poster child of scientists who have committed scientific misconduct and fraud and got away with it.  The statements in the Article that attribute the fact that Dr. Croce "got a pass" for his repeated wrongdoing to "inherent conflicts" resulting from the millions OSU "reaps" from his grants do nothing to diminish or ameliorate the defamatory sting of the Article.   The fundamental defamatory point is still the same – Dr. Croce committed scientific misconduct and fraud and got away with it.

**The Broader Context of Defendants'**
**False and Defamatory Statements of Fact.**

218.     The New York Times placed the Defamatory Article on the front page of both its digital and print versions of the New York Times.  It did not appear on the Editorial, Opinion or

60

Commentary pages. The Defamatory Article was not denoted as an opinion piece or a commentary.

219. At the exact time that the Defamatory Article was published, The New York Times was in the midst of a massive marketing campaign, rolled out in January of 2017, positioning itself as a warrior of Truth, with such taglines as: "**Truth. It's Hard To Find**" and "**Just Facts. No Alternatives**."

220. **"Open Records Close The Case."** The print version of the Defamatory Article was published with a related article on page 2 (also not in the Opinion or Editorial Pages) under the banner: "**Inside the Times – The Story Behind the Story**." The article's headline is "Open Records Close the Case." A true and accurate copy of the "Open Records Close the Case" article is attached hereto and incorporated herein as Exhibit E. The digital version of this article is accompanied by the tagline: "**Journalists on the ground. Stories grounded in facts**."

221. The "Open Records Close the Case" article quotes Defendant Glanz as saying that "Ohio is paradise for open documents" and states that "[r]arely do reporters encounter as few obstacles as they did in this case," suggesting that the "investigation" produced evidence to support the facts recited in the Defamatory Article. Defendant Armendariz is quoted as saying "Here, everything just kept adding up."

222. The headline saying that the open records "close the case" is clearly intended to mean the "case" stated against Dr. Croce in the Defamatory Article is proven fact. Those statements do not give the reasonable reader the impression that the authors are presenting opinions.

223.    The broader context of the Defamatory Article as a whole is therefore that it is reporting facts, i.e., that Dr. Croce is actually guilty of years of research fraud and scientific misconduct and got away with it solely because Ohio State "reaped millions from his grants."

224.    The broader context of the Defamatory Article as a whole is therefore that it is reporting facts, i.e., that Dr. Croce is actually guilty of years of research fraud and scientific misconduct and got away with it solely because Ohio State "reaped millions from his grants."

### The Defamatory Nature of the False Statements

225.    In addition to being factually false, all of the False and Defamatory Statements, as well as the Defamatory Article as a whole, are defamatory per se and/or per quod.  So are the false and defamatory statements in the Defamatory Letter and in Glanz' WOSU radio interview. Each and all of those statements, read in context, tend to, and do, (a) degrade and disgrace Dr. Croce, (b) hold Dr. Croce up to public hatred, contempt, and scorn, and (c) injure Dr. Croce in his trade, profession, and occupation.

226.    The degradation, disgrace, public hatred, contempt and scorn generated by the Defamatory Article is proven by the reasonable readers whose comments the Times reviewed and chose to publish.  Based upon their reasonable reading of the Defamatory Article, those readers concluded that Dr. Croce is a "con man," a "fraud," a "crook," a "liar," a "cockroach" that "scurried out from under a rock," a "murderer," or a scientist "guilty of misconduct."  Dr. Croce is none of those things.  The tragedy of this outrageous defamation is that Dr. Croce is the exact opposite of all of that.

227.    Dr. Croce is a dedicated scientist who has poured his heart and soul into painstaking work to advance the fight against cancer and whose work has led to a therapy that is now in fact saving and prolonging the lives of those suffering from an advanced form of chronic

lymphocytic leukemia. In a field replete with stellar scientists, Dr. Croce has been described as "constantly maintaining a position near the very top," and "in the field of lymphoma pathogenesis, he has always been the 'lodestar.'"

### Facts Further Demonstrating Defendants'
### Actual Malice and Ordinary Negligence

Defendants Knew That A Significant Factual Premise of the Defamatory Article Was False.

228.    A false factual premise upon which Defendants' Defamatory Article significantly depends is that OSU let Dr. Croce get away with years of ethics violations, scientific misconduct and fraud because OSU "reaped millions from his grants." The facts are the opposite.

229.    Defendants knew, before they published the Defamatory Article, that OSU had spent significantly more to support Dr. Croce's research program than he brought in from outside sources, such as grants. Defendants knew this because OSU told this to Defendant Glanz prior to the publication.

230.    Defendants' knowledge of this fact rendered false their assertion that Dr. Croce was found not to have committed any ethics violation, scientific misconduct, or fraud because OSU "reaped millions" from Dr. Croce's grants. Defendants knew instead that OSU had found Dr. Croce not guilty of any ethics violations, scientific misconduct, or fraud because Dr. Croce had in fact not committed any ethics violations, scientific misconduct, or fraud.

231.    In the March 9, 2017, WOSU radio interview, Defendant Glanz was asked the following question and gave the following answer:

> WOSU: OSU also says they have invested much more in Dr. Croce's research than he has helped earn for the university.
>
> Glanz: Right, we were not able to verify that, but that is what they told us, that's all I know about that.

232.     Thus, despite having been told by OSU facts negating a significant factual premise of the Defamatory Article, Defendants published it anyway, to tens of millions of people who now erroneously believe that Dr. Croce is a con man and a crook and that OSU is unprincipled and mercenary.  Defendant's publication of the Defamatory Article with knowledge of the falsity of this factual premise constitutes actual malice.

233.     Defendant Glanz' dismissive assertion that "we were not able to verify" what OSU told him is also false.  Defendant Glanz was indeed able to "verify" OSU's assertion. Defendants made no effort to do so, by public records request or otherwise.

234.     Defendants' failure to "verify" OSU's assertion was willful and constitutes actual malice.  At a minimum, Defendants recklessly disregarded whether this factual premise of the Defamatory Article was false or not.  Defendants also failed to act reasonably in attempting to discover the truth or falsity of this factual premise, and therefore were negligent in publishing it.

235.     On information and belief, Defendants did not want verification.  Glanz and his collaborators had worked for months on an incendiary article that would make the inflammatory and explosive accusation that a major university had allowed one of its leading scientists to repeatedly "get a pass" on ethics charges, scientific misconduct, and fraud because the university "reaped millions" from his grants.

236.     On information and belief, Defendants were not going to let the true facts stand in the way of a front page headline and story that was sensational enough to grab the attention of (and, indeed, incite the wrath of) millions of readers.  Defendants accomplished their objective. The Defamatory Article spread rapidly throughout the United States and the world.  It immediately rose to Number One on the New York Times' list of Most Popular articles.  It

generated venomous and accusatory comments from readers who read it exactly as Defendants maliciously intended it.

### Defendants' Failure to Respond to Dr. Croce's
### Requests for Information in Response to the Defamatory Letter

237. In addition to misrepresenting the purpose of Glanz' visit to Dr. Croce and ignoring what OSU had told them, Defendants also repeatedly ignored Dr. Croce's requests that Glanz provide the further information that Defendant Glanz offered to provide and which Dr. Croce sought in his response to the Defamatory Letter.

238. Having offered to provide further information to Dr. Croce, Defendant Glanz had no basis for not providing that further information.

239. Defendants' failure to respond to those questions is further evidence of their actual malice and reckless disregard of whether the false factual statements they made in the Defamatory Article were false or not.

240. Defendants also knew the following with regard to the two papers referred to OSU by ORI and investigated by OSU:

a. The figures in those papers were not prepared by Dr. Croce;

b. The figures in those papers were prepared by post-doctoral fellows or graduate students in Dr. Croce's laboratory, none of whom had any intention to publish incorrect figures;

c. Neither Dr. Croce nor anyone in his laboratory (whether post-doctoral fellows or graduate students) had any reason or motive to publish incorrect figures, because (as Defendants knew) the honest errors in figure construction had no bearing on the scientific conclusions in those papers;

      d.      Honest errors in figure construction, particularly involving the control panels on western blots, can sometimes occur because control panel images look very much alike;

      e.      The fact that a figure is corrected through a published correction does not mean research misconduct occurred;

      f.      Both ORI and OSU concluded no research misconduct, ethics violation or fraud occurred; and

      g.      No scientific conclusion in any of Dr. Croce's papers has ever been altered by any of the figure corrections.

241.      Defendants made no effort to interview the post-doctoral fellows or graduate students who worked on any of the papers mentioned in the Defamatory Letter or the Defamatory Article.

242.      Defendants also knew that, of four subsequent allegations sent to OSU by the anonymous "Clare Francis" in December 2013, three of them related to papers written by other scientists in other institutions, with respect to which neither Dr. Croce nor any other OSU employee generated or provided any data for the figures in question.  Defendants also knew that the fourth was a repetition of an allegation that had previously been provided by that same whistleblower to ORI and to OSU and as to which ORI had already concluded no further consideration was warranted.

**Actual and Special Harm To Plaintiff**
**(including monetary damages)**

243.      As a direct and proximate result of Defendants' defamation, as described herein, Dr. Croce has suffered and will continue to suffer actual harm consisting of significant pecuniary

harm, significant harm to his reputation and standing in the community, personal humiliation, mental and emotional anguish, and suffering.

244.    Dr. Croce's work is his life and, for a scientist like Dr. Croce, scientific integrity is the most important thing.  Dr. Croce has for decades worked extremely hard to provide an example for younger scientists and to help young scientists who come through his lab to make important discoveries.  The AACR has honored Dr. Croce for his extraordinary scientific leadership and mentorship of talented young investigators.

245.    For Dr. Croce, having his scientific integrity falsely maligned is devastating.  To have his integrity falsely impugned in a front-page article in the New York Times that is instantly distributed to millions throughout the world is crushing.  The harm inflicted by false accusations of scientific misconduct has far-reaching effects, not only for Dr. Croce, but also for the scientists who have worked with him.

246.    Dr. Croce has suffered, and will continue to suffer, pecuniary harm.  For years prior to the publication of the Defamatory Article, Dr. Croce was repeatedly retained to provide expert advice and consultation in his field of expertise and/or retained as an expert witness in litigation on patent matters.  The fees earned by Dr. Croce for those services exceeded several hundred thousand dollars.  From April 2017 through the date of this Amended Complaint, Dr. Croce has not been asked to perform any further such services.  Defendants' publication of the Defamatory Article asserting that Dr. Croce has repeatedly been given a pass for research misconduct and fraud is fatal to any experienced attorney's willingness to retain Dr. Croce as a scientific expert witness on litigation or other legal matters.  Upon information and belief, the Defamatory Article, and the damage to Dr. Croce's reputation caused by the Defamatory Article, has made Dr. Croce less attractive as an expert witness and proximately caused a diminution in

Dr. Croce's ability to attract expert work, with an economic loss in the hundreds of thousands of dollars.

247.     In the years prior to the Defamatory Article, Dr. Croce had regularly been one of the few persons considered to receive an award for his research accomplishments at an international conference on malignant lymphoma held in Lugano, Switzerland.  Recipients of the award are paid $100,000.  In 2017, after the Defamatory Article was published, Dr. Croce was not even discussed as a candidate for that award.  On information and belief, a proximate cause of Dr. Croce not even being considered was the Defamatory Article.

248.     Dr. Croce suffered further special harm when, after reading the Defamatory Article, a prestigious scientific research fund that awards an annual scientific prize revoked its invitation to Dr. Croce to sit on the selection panel for the 2018 prize.  Dr. Croce had previously won this prize in 2013, and it was a distinct honor to receive the invitation to sit on the selection panel, and Dr. Croce had accepted that invitation.  The appointment carried with it an expense-paid trip to Europe and an honorarium of 2500 euros.  However, after reading the Defamatory Article, and with specific reference to it, the organization that awards the prize notified Dr. Croce that the decision had been made that he would not be kept as a member of the selection panel. The Defamatory Article was a proximate cause of the decision by the organization that awards the prize to revoke its invitation to Dr. Croce to participate in the selection panel.

249.     As a result of the revocation of the invitation, Dr. Croce suffered further harm to his reputation and suffered pecuniary harm in the form of loss of the honorarium and paid travel.

250.     Time and discovery are likely to produce evidence of additional negative economic impacts of Dr. Croce's diminished reputation.

251.     The comments of the reasonable readers of the Article evidence the fact that the Defamatory Article tended to, and in fact did, degrade or disgrace Dr. Croce and hold him up to public hatred, contempt or scorn.  The statements also tended to, and in fact did, injure Dr. Croce in his trade, profession, or occupation.

252.     Dr. Croce has experienced personal humiliation and mental anguish, has lost weight and lost sleep.  He is embarrassed by the fact that millions of people worldwide have read an article that so falsely maligns not only him, as a scientist and as a person, but also maligns his life's work.

253.     The defamation by Defendants further provoked readers of the New York Times and other third parties to write comments, blog entries, social media posts, and other online content subjecting Dr. Croce to public hatred, contempt, ridicule, shame and disgrace, which further caused Dr. Croce to experience humiliation, embarrassment and mental anguish. Defendants knew the Defamatory Article would produce such a reaction.

254.     Dr. Croce has been forced to expend significant time, effort and costs to respond to the Defamatory Letter and Defamatory Article.

## COUNT I

### Defamation Per Se

255.     Plaintiff repeats and incorporates by reference herein each of the preceding paragraphs.

256.     Defendants' statements in the Defamatory Article, the WOSU radio interview, and the Defamatory Letter are each and all defamatory per se.

### The Defamatory Article

257. The False and Defamatory Statements in the Defamatory Article and the Defamatory Article as a whole are defamatory per se because, on their face and without resort to any extrinsic facts, they tended to, and in fact did,

     a.     degrade and disgrace Dr. Croce;

     b.     hold Dr. Croce up to public hatred, contempt, and scorn; and

     c.     injure him in his trade, profession, and occupation.

258. The False and Defamatory Statements in the Defamatory Article and the Defamatory Article as a whole are defamatory per se for the additional reason that, on their face and without resort to any extrinsic facts, a reasonable fact finder could conclude that they imply an assertion that tended to and in fact did:

     a.     degrade and disgrace Dr. Croce;

     b.     hold Dr. Croce up to public hatred, contempt, and scorn; and

     c.     injure him in his trade, profession, and occupation.

259. The False and Defamatory Statements in the Defamatory Article and the Defamatory Article as a whole, are defamatory per se because, on their face and without resort to any extrinsic facts, they impute to Dr. Croce professional misconduct and a lack of integrity.

260. There exists no reasonable reading of the False and Defamatory Statements or the Defamatory Article as a whole that does not injure, or tend to injure, Dr. Croce in his trade, profession or occupation, and/or expose or tend to expose Dr. Croce to public hatred, contempt, ridicule, shame or disgrace.

261. The only reasonable reading of the Defamatory Article with its False and Defamatory Statements is that Dr. Croce has for years been guilty of scientific misconduct and fraud but was "repeatedly cleared" because OSU "reaps millions from his grants." This is false

and defamatory in every respect. Dr. Croce has never committed scientific misconduct or fraud, and OSU spent significantly more supporting Dr. Croce's research program than Dr. Croce brought in from outside sources, such as grants.

262. Defendants knew of and intended that reasonable readers would understand the Defamatory Article to convey the defamatory meaning that Dr. Croce is guilty of scientific misconduct and fraud.

263. The Defamatory Article containing the False and Defamatory Statements was published to millions of people throughout the world.

264. Defendants published the False and Defamatory Statements in the Defamatory Article and the Defamatory Article with knowledge that they were false and/or with reckless disregard of whether they were false or not. Defendants therefore published the False and Defamatory Article containing the False and Defamatory Statements with actual malice.

265. Defendants failed to act reasonably in attempting to discover the truth or falsity of the False and Defamatory Statements in the Defamatory Article and the Defamatory Article before publishing them and were therefore negligent in publishing them.

266. Because the Defendants' False and Defamatory Statements and the Defamatory Article as a whole are defamatory per se, general damages are presumed.

267. In addition, as a direct and proximate result of Defendants' publication of the Defamatory Article containing the False and Defamatory Statements, Dr. Croce has suffered and will continue to suffer actual and material harm to his reputation and standing in the community, personal humiliation, mental and emotional anguish and suffering, as well as special damages, including the monetary damages described in paragraphs 246 through 250 of this Amended Complaint.

268.    In making the defamatory statements, Defendants acted intentionally, maliciously, willfully and with the intent to injure Dr. Croce and/or to benefit themselves.

269.    Defendants are liable to Dr. Croce for punitive damages in an amount to be proven at trial.

**Glanz's Statements in the WOSU Radio Interview**

270.    Defendant Glanz' statements in the WOSU Radio Interview were defamatory per se because, on their face and without resort to any extrinsic facts, they tended to, and in fact did:

  a.      degrade and disgrace Dr. Croce;

  b.      hold Dr. Croce up to public hatred, contempt, and scorn; and

  c.      injure him in his trade, profession, and occupation.

271.    Defendant Glanz' statements in the WOSU Radio Interview are defamatory per se for the additional reason that, on their face and without resort to any extrinsic facts, they impute professional misconduct and a lack of integrity on the part of Dr. Croce.

272.    There exists no reasonable meaning of Defendant Glanz' false and defamatory statements in the WOSU Radio Interview that does not tend to injure Dr. Croce in his trade, profession or occupation, and/or tend to expose Dr. Croce to public hatred, contempt, ridicule, shame or disgrace.  The only reasonable reading of those statements is that Dr. Croce and the lab he oversees "fabricate figures," by "duplicating data from unrelated experiments to prove a point in another experiment" and that because they are "part of a pattern" they are not "honest errors."

273.    Defendants knew of and intended that reasonable readers would understand Glanz' false and defamatory statements in the WOSU Radio Interview to convey this defamatory meaning.

274.    Defendant Glanz' defamatory statements in the WOSU Radio Interview are statements of fact that are verifiably false.

275.    Defendant Glanz' defamatory statements in the WOSU Radio Interview were published to all who listened to the radio interview, as well as to the WOSU interviewer, who described them as "damning."

276.    Defendant Glanz made these false and defamatory statements with knowledge that they were false and/or with reckless disregard of whether they were false or not.  Defendants therefore published the false and defamatory statement with actual malice.

277.    Defendants failed to act reasonably in attempting to discover the truth or falsity of Defendant Glanz' false and defamatory statements before Defendant Glanz published them and were therefore negligent in publishing them.

278.    Because Defendant Glanz' false statements in the WOSU Radio Interview are defamatory per se, general damages are presumed.

279.    In addition, as a direct and proximate result of Defendant Glanz' publication of the false and defamatory statement in the WOSU Radio Interview, Defendant has suffered and will continue to suffer harm to his reputation and standing in the community, personal humiliation, mental and emotional anguish and suffering, as well as special damages, including the monetary damages described in this Amended Complaint.

280.    In making the defamatory statements, Defendant Glanz acted within the course and scope of his employment and with the intention to maliciously and willfully injure Dr. Croce and/or to benefit Defendants.

281.    Defendants are liable to Dr. Croce for punitive damages in an amount to be proven at trial.

**The Defamatory Letter**

282.    The false statements in the Defamatory Letter are defamatory per se because, on their face and without resort to any extrinsic facts, they tend to, and in fact did:

73

      a.     degrade and disgrace Dr. Croce;

      b.     hold Dr. Croce up to public hatred, contempt, and scorn; and

      c.     injure him in his trade, profession, and occupation.

283.    The false statements in the Defamatory Letter are defamatory per se because, on their face and without resort to any extrinsic facts, a reasonable fact finder could conclude that they imply an assertion that tended to and did:

      a.     degrade and disgrace Dr. Croce;

      b.     hold Dr. Croce up to public hatred, contempt, and scorn; and

      c.     injure him in his trade, profession, and occupation.

284.    The false statements in the Defamatory Letter are defamatory per se because, on their face and without resort to any extrinsic facts, they impute professional misconduct and a lack of integrity on the part of Dr. Croce.

285.    There exists no reasonable reading of the Defamatory Letter that does not tend to injure Dr. Croce in his trade, profession or occupation, and/or tend to expose Dr. Croce to public hatred, contempt, ridicule, shame or disgrace.

286.    The only reasonable reading of the Defamatory Letter is that Dr. Croce and the lab he oversees (a) is "knowingly engaging in scientific misconduct and fraud," (b) "routinely handles experimental data improperly;" (c) "routinely uses data duplicated from one experiment in figures for unrelated experiments;" (d) "exercises little oversight when colleagues engage in those practices;" (e) "routinely plagiarizes or allows to be plagiarized text from papers written by other authors;" (f) "reviewed and awarded countless grants using CTR money, often in cases with clear conflicts of interest involving grantees at" Thomas Jefferson University; and (g)

falsely represented to OSU, when he was recruited, that the FHIT gene was a "promising route for therapeutics," when it was instead "a complete failure."

287. Defendants knew of and intended that reasonable readers would understand the Defamatory Letter to convey this defamatory meaning.

288. The Defamatory Letter was published to Dr. Croce's employer, the Ohio State University.

289. Because these false statements in Defamatory Letter are defamatory per se, general damages are presumed.

290. In addition, as a direct and proximate result of Defendant Glanz' publication of the false and defamatory statements in the Defamatory Letter, Defendant has suffered and will continue to suffer harm to his reputation and standing in the community, personal humiliation, mental and emotional anguish and suffering, as well as special damages, including the monetary damages described in this Amended Complaint.

291. Defendant Glanz published the Defamatory Letter within the course and scope of his employment and with the intention to maliciously and willfully injure Dr. Croce and/or to benefit Defendants. Defendants are liable for Defendant Glanz' tortious acts conducted within the course and scope of his employment.

292. Defendants are liable to Dr. Croce for punitive damages in an amount to be proven at trial.

## COUNT II

### Defamation per Quod

293.    Plaintiff repeats and incorporates by reference herein each of the preceding paragraphs.

294.    In the alternative, if it is determined that the words of any one or more of the false statements appear harmless on their face and therefore are determined not to be defamatory per se, or are determined for any other reason not to be defamatory per se, then they are defamatory per quod.

295.    The meaning reasonably drawn from the defamatory statements is that Dr. Croce is a dishonest scientist who has for years been guilty of data falsification, data fabrication, research misconduct and fraud, but OSU let him get away with it so that OSU could continue to reap millions from Dr. Croce's grants.  If this meaning is not defamatory per se, then it is defamatory per quod, because the false and defamatory statements (individually and collectively) tended to, and in fact did:

      a.    degrade and disgrace Dr. Croce;

      b.    hold Dr. Croce up to public hatred, contempt, and scorn; and

      c.    injure him in his trade, profession, and occupation.

296.    As a direct and proximate result of the defamatory statements alleged herein, Dr. Croce has suffered harm, including the harms set forth in paragraphs 246-250, above.

### COUNT III

### Invasion of Privacy – False Light

297.    Plaintiff repeats and incorporates by reference herein each of the preceding paragraphs.

298.    By making and publicizing the Defamatory Article and the False and Defamatory Statements described above, Defendants placed Dr. Croce before the public in a false light.

299.    The publicity given to Dr. Croce through the Defamatory Article and the False and Defamatory Statements, including Defendants' defamatory social media posts and Glanz' interview on WOSU, is unreasonable and highly objectionable, and attributes to Dr. Croce false characteristics, false conduct and false beliefs.

300.    The fact that the publicity given to Dr. Croce through the Defamatory Article, Defendants' social media posts and Glanz' interview on WOSU actually placed him in a highly objectionable light is demonstrated by the many reader comments calling him, among other things, a "con man," a "fraud," a "crook," a "liar," a "cockroach" that "scurried out from under a rock," a "research fraud" and a "fraud to science."

301.    The Defamatory Article, Defendants' social media posts and Glanz' comments in his interview with WOSU misrepresent Dr. Croce's character, history, activities and beliefs in a highly offensive manner, such that serious offense would reasonably be expected to be taken by any person in Dr. Croce's position.

302.    Defendants knew that Dr. Croce, as a reasonable person, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the false publicity.

303.    Defendants had knowledge of and acted in reckless disregard of the falsity of the publicized matter and the false light into which it placed Dr. Croce.

304.    As a proximate result of Defendants' publicizing of the Defamatory Article and the False and Defamatory Statements of Fact, including Defendants' social media posts and Defendant Glanz' statements in the WOSU interview, Dr. Croce has suffered and will continue to suffer actual harm to his reputation and standing in the community, personal humiliation and

mental and emotional anguish and suffering, as well as monetary damages in an amount to be determined at trial.

305.    In publicizing the Defamatory Article, False and Defamatory Statements, Defendants' social media posts and Glanz' statements in the WOSU interview, Defendants acted intentionally, maliciously, willfully and with the intent to injure Dr. Croce and/or to benefit themselves.

306.    Defendants are liable to Dr. Croce for punitive damages in an amount to be proven at trial.

## COUNT IV

### Intentional infliction of emotional distress

307.    Plaintiff repeats and incorporates by reference herein each of the preceding paragraphs.

308.    By making the Defamatory Letter, Defamatory Article, the False and Defamatory Statements, Defendants' social media posts and Glanz' statements in the WOSU interview, all as described above, Defendants either intended to cause Dr. Croce serious emotional distress, or knew or should have known that their conduct would result in serious emotional distress.

309.    Defendant's conduct, as described herein, was extreme and outrageous, going beyond the bounds of decency.  An average member of the community, including of the scientific community, would feel anger and resentment at Defendants' conduct, and would consider the conduct to be outrageous and intolerable.

310.    As a further result of Defendants' actions, Dr. Croce has suffered serious personal humiliation and mental anguish, all of a nature that no reasonable person could or should be expected to endure.

WHEREFORE, Plaintiff Carlo M. Croce demands judgment against Defendants for presumed, actual, and special damages in an amount to be proven at trial, punitive damages in an amount to be proven at trial, all costs, interest, attorneys' fees and other amounts permitted by law, and such other and further relief as this Court may deem just and proper.

/s/ Thomas W. Hill
Thomas W. Hill      (0012182)
Loriann E. Fuhrer    (0068037)
KEGLER, BROWN, HILL & RITTER
A Legal Professional Association
65 E. State Street, Suite 1800
Columbus, Ohio  43215
(614) 462-5400 Phone
(614) 464-2634 Fax
thill@keglerbrown.com
lfuhrer@keglerbrown.com
Attorneys for Plaintiff, Carlo M. Croce, M.D.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable of right by a jury.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed this 15th day of January, 2018, using the Court's CM/ECF system which will send electronic notification to all counsel of record in this action.

/s/ Thomas W. Hill
Thomas W. Hill